*06851)*

Kirkpatrick & Lockhart
Nicholson Graham LLP
599 Lexington Avenue
New York, New York 10022-6030
Attn: Jeffrey Rich
Facsimile: (212) 536-3901

---

³     To be updated per merger of ABB Oil and Gas into ABB Holdings Inc., with ABB Holdings Inc. as the surviving
entity.

⁴     To be updated per merger of ABB Oil and Gas into ABB Holdings Inc., with ABB Holdings Inc. as the surviving
entity.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

Kirkland & Ellis LLP
Citicorp Center
153 E. 53rd Street
New York, NY 10022-4675
Attn: Theodore L. Freedman
Facsimile: (212) 446-4900

3.7.   *Waiver of Presentment, etc.* The Maker hereby waives presentment and demand for payment, notice of dishonor, protest and notice of protest of this Note. The Maker hereby waives the pleading of any statute of limitations as a defense to any demand hereunder against such Maker.

3.8.   *Waivers.* No delay on the part of the Permitted Holder in exercising any right or remedy under this Note or failure to exercise the same shall operate as a waiver in whole or in part of any such right or remedy.

3.9.   *Captions.* The captions of the sections and subsections of this Note have been inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Note.

3.10.   *Severability.* If any term of this Note shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of all other terms hereof shall in no way be affected thereby.

3.11.   *Binding Nature.* This Note shall be binding upon the Maker and its successors and permitted assigns and shall inure to the benefit of the Permitted Holder, and its successors and permitted assigns.

3.12.   *Governing Law; Jurisdiction.*

(i) This Note and the rights and obligations of the parties hereto shall be construed in accordance with the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(ii) With respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Note (such claims, suits, actions, proceedings, and other disputes, the *"Claims"*) the Maker and the Permitted Holder hereby irrevocably submit to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware (the *"Courts"*), or, if both such Courts are not permitted under applicable law to exercise jurisdiction with respect to the matter in question, then at the sole election of the Permitted Holder to the jurisdiction of any other federal or state court in the state, county and city of New York, New York and in the County of New Castle or the city of Wilmington, Delaware.

(iii) Subject to the preceding paragraph, the Permitted Holder and the Maker hereby (a) submit to the jurisdiction of the courts as and for the limited purpose described above, and (b) agree that any and all Claims may be brought, heard and determined in such courts.

(iv) The Maker and the Permitted Holder agree that venue shall be proper in such courts and hereby waive any objection or defense which either may now or hereafter have to the laying of venue in such courts, including any of the foregoing based upon the doctrine of *forum non conveniens*. The Maker and the Permitted Holder hereby agree that all

process which may be or be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such suit, action, proceeding, claim or dispute) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under this Note and shall be deemed in every respect effective service of process upon such party when so given.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

3.13.  *No Modification Except in Writing.* Neither this Note nor any provisions hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by both parties hereto, and then only to the extent set forth in such instrument.

3.14.  *Gender/Number.* As used in this Note, the masculine shall include the feminine and neuter and vice versa; the singular shall include the plural and the plural shall include the singular, as the context may require.

3.15.  *Transferability and Assignment.*

(a) Neither the Lummus Asbestos PI Trust nor any Permitted Holder may assign nor transfer any of its rights or obligations under this Note without the prior written consent of the Maker (such consent not to be unreasonably withheld, conditioned or delayed); *provided, however,* that (A) the Lummus Asbestos PI Trust or a Permitted Holder, as applicable, shall under no circumstance (excluding upon the occurrence and during the continuance of an Event of Default) be permitted to assign or transfer less than all of its rights and obligations under this Note, and any assignment must be made in compliance with federal, state and other securities laws, (B) following any assignment or transfer by the Lummus Asbestos PI Trust, no failure by the Maker or a Guarantor to perform any of its obligations under this Note shall cause or be the basis for an Injunction Default; and (C) the consent of the Maker shall not be required for any assignment or transfer consummated during the continuance of an Event of Default.

(b) The Maker may not assign or transfer its rights or obligations under this Note without the prior written consent of the Permitted Holder, which consent may be withheld, conditioned or denied by the Permitted Holder in its sole and absolute discretion.

(c) Notwithstanding the preceding paragraph (b), however, neither such paragraph nor anything else in this Note shall restrict at any time the ability of the Maker to merge with or into, sell all or substantially all of its assets to, or otherwise consolidate with or into, any Entity which, immediately following such transaction, is directly or indirectly a Wholly Owned Subsidiary of ABB, provided, however, that, unless the Permitted Holder consents otherwise in writing (i) immediately after such transaction the surviving or succeeding Entity (which includes any Entity to which all or substantially all of the assets of the Maker have been transferred) shall be an Entity formed or organized under the laws of the United States or a state thereof; (ii) the surviving or succeeding Entity shall have, after giving effect to the relevant transaction, a Consolidated Net Worth equal to or greater than the Consolidated Net Worth of the Maker; (iii) no Event of Default and no event which, with the giving of notice or the passage of time, would constitute an Event of Default, shall exist immediately following the consummation of such transaction; (iv) such transaction does not conflict with, or result in a breach of, any of the provisions of, or constitute an event of default under, the certificate of incorporation or the by-laws of the Maker or such surviving or succeeding Entity is bound or any other material agreement or material contract by which the Maker or such surviving or succeeding Entity or any applicable law, or any applicable order, rule or regulation of any court or governmental agency having jurisdiction; (v) consummation of such transaction shall not materially impair the Maker's ability to perform pursuant to this Note; (vi) at least 10 days prior to consummation of such transaction, such Maker shall deliver to the Permitted Holder written notice of its intent to consummate such transaction, and (vi) at the closing of such transaction, the surviving or succeeding Entity shall deliver, or cause to be delivered, to the Permitted Holder a certificate from the chief executive officer, chief operating officer, chief financial officer, treasurer or controller of such Entity, to the effect that such officer has reviewed this Note for purposes of giving such certificate, that such officer is familiar with the facts related to the transaction being consummated and that such officer certifies that such transaction complies in all material respects with the provisions of this Section 3.15(c) and is being undertaken for a valid business purpose.

(d) Prior to, or concurrently with, the consummation of any such merger, sale of assets or consolidation, as applicable, the surviving or succeeding Entity shall (i) by written instrument in form and substance reasonably acceptable to the Permitted Holder expressly assume the rights and obligations of the

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

Maker hereunder, whereupon such Entity shall be the successor of all rights and obligations of the original Maker hereunder, with the same effect as if it had been originally named herein; provided however, that the Maker shall not be discharged from, and shall remain liable for, any and all obligations and liabilities under this Note; and (ii) cause the owner of at least 51% of its Capital Stock to pledge such Capital Stock to the Permitted Holder on substantially the same terms as those contained in the Pledge and Irrevocable Proxy and will cause each of the Guarantors to acknowledge in writing in form and substance reasonably satisfactory to the Permitted Holder, that such transaction will not affect such Guarantor's obligations under the applicable Guaranty.

(e) The Maker shall be responsible for and shall pay promptly upon demand all reasonable costs and expenses incurred by the Permitted Holder (including reasonable legal fees and expenses) in connection with the transactions proposed by the Maker pursuant to Section 3.15 (whether or not such transaction is in fact consummated).

(f) Maker shall maintain a register on which it records the name and address of the Permitted Holder.

(g) Any assignment in breach of this Section 3.15 shall be null and void, and shall not transfer any interest in this Note to any other Entity.

3.16.  *Definitions*. The following capitalized terms used herein shall have the meanings set forth below:

"*ABB*" means ABB Ltd, a corporation formed under the laws of Switzerland.

"*ABB Group*" means ABB and its Subsidiaries from time to time.

"*ABB Holdings*" means ABB Holdings Inc., a Delaware corporation.

"**[ABB Oil and Gas]**[5]" means ABB Oil and Gas USA Inc., a Delaware corporation.

"*Asset Sale*" means any sale or other disposition of any assets of Lummus or any of its Subsidiaries occurring after March 15, 2005, other than a sale or disposition of assets (i) in the Lummus Ordinary Course of Business or (ii) exclusively to Lummus or any Subsidiary of Lummus.

"*Assumed Debt*" means, in respect of an Asset Sale, the aggregate amount of any indebtedness for borrowed money plus the fair value of any liabilities (whether contingent or otherwise) in respect of letters of credit or credit support arrangements owed by any Entity of the ABB Group and assumed by a purchaser (or any Entity as designee of such purchaser) in connection with such Asset Sale.

"*Business Day*" means any day excluding Saturday, Sunday or a federal holiday in the United States or a holiday in the State of New York.

"*Capital Stock*" means, with respect to any Entity, any share of stock, or any depositary receipt or other certificate representing any share of stock or similar equity ownership interest, and any warrant, option, or any other security providing for the right to acquire any such share of common stock or similar equity ownership interest.

"*Cash Equivalents*" means, in respect of an Asset Sale, any note or other instrument or agreement pursuant to which a buyer is obligated to make one or more deferred payments in cash of all or a portion of the purchase price relating to such Asset Sale.

"*Claim*" has the meaning set forth in Section 3.12(ii) hereof.

---

[5]    To be updated per merger of ABB Oil and Gas into ABB Holdings Inc., with ABB Holdings Inc. as the surviving entity.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

"*Complete Asset Disposition*" means an Asset Sale of all or substantially all of the then remaining assets of Lummus or its Subsidiaries.

"*Consolidated Net Worth*" of any Entity means, as of any date of determination, the sum of all items which pursuant to the generally accepted accounting principles then applicable to the relevant Entity are included in shareholders' or owners' equity on a consolidated balance sheet of such Entity and its Subsidiaries as of such date.

"*Court*" has the meaning set forth in Section 3.12(ii) hereof.

"*Default Rate*" has the meaning set forth in Section 1.4 hereof.

"*Disputed Payment*" has the meaning set forth in Section 2.3 hereof.

"*Dollars*" means the lawful currency of the United States of America.

"*Effective Date*" has the meaning set forth in the Glossary.

"*Entity*" has the meaning set forth in the Glossary.

"*Event of Default*" has the meaning set forth in Section 2.1 hereof.

"*Exit Financing*" [to come][6]

---

[6]    "Exit Financing" will be defined as an amount to be equal to the amount of any financing (whether for borrowed money or credit support), provided by any Entity (including any Entity of the ABB Group) to Lummus and any Subsidiaries of Lummus, on or after the "Effective Date" of the Lummus plan of reorganization pursuant to one or more "exit" financing facilities and including any refinancing, amendment or modification thereof.

Such financing facilities will be unsecured and in an aggregate amount determined by Lummus, which amount, if so determined by Lummus, may be at least equal to the sum of (A) the Pre-petition Short-Term Working Capital Financing; (B) any financing (whether for borrowed money or credit support) provided to Lummus and any Subsidiaries of Lummus on or after the Petition Date pursuant to a debtor-in-possession credit facility under §364 of the Bankruptcy Code; and (C) any additional financing requirements (whether for borrowed money or credit support) of Lummus and any Subsidiaries of the Lummus on and after the Effective Date of the Lummus plan of reorganization. Whether the Exit Financing is provided by an Entity of the ABB Group or by another Entity, the terms and conditions thereof shall include subordination provisions identical in all material respects with the terms set forth in Section 3.2 of the Settlement Agreement.

For purposes of the Exit Financing, "Pre-petition Short-Term Working Capital Financing" means the indebtedness (whether for borrowed money or credit support) for principal, interest and other fees, costs and expenses outstanding as of the moment in time immediately prior to the filing of the petition for relief pursuant to Chapter 11 by Lummus, for advances or loans made by any Entity of the ABB Group to Lummus and its Subsidiaries between the close of business of the thirty-first (31st) consecutive calendar day prior to the Petition Date (the "*Cutoff Date*") and the moment in time immediately prior to the filing of the petition for relief pursuant to Chapter 11 by Lummus.

For the sake of clarity, "Pre-petition Working Capital" shall include all contingent obligations of Lummus or its Subsidiaries to any Entity of the ABB Group on account of credit support provided to Lummus or its Subsidiaries incurred between the Cutoff Date and the moment in time immediately prior to the filing for relief pursuant to Chapter 11 by Lummus, but shall not include obligations (contingent or otherwise) of Lummus or its Subsidiaries to any Entity of the ABB Group on account of credit support obligations created or incurred prior to the Cutoff Date.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

"*Final Order*" has the meaning set forth in the Glossary.

"*Glossary*" means the Glossary of Terms for the Plan Documents pursuant to the Prepackaged Plan of Reorganization of ABB Lummus Global Inc.

"*Guaranty*" means the guarantee of payment obligations of the Lummus Note of ABB, ABB Holdings and [**ABB Oil and Gas**]'.

"*Guarantors*" means ABB Holdings, [**ABB Oil and Gas**][c] and ABB.

"*Indirect Stock Disposition*" means the consummation of a transaction, the result of which is that the Maker ceases to be, directly or indirectly, a Wholly-Owned Subsidiary of ABB.

"*Injunction Default*" has the meaning set forth in the Glossary.

"*Lummus Asbestos PI Trust*" has the meaning set forth in the preamble hereof.

"*Lummus FCR*" has the meaning set forth in the Glossary.

"*Lummus Ordinary Course of Business*" means the ordinary course of business of Lummus and its Subsidiaries, consistent in all material respects with the manner in which it was conducted prior to March 15, 2005; *provided*, that the licensing and sale of technology for the oil & gas, refining and petrochemical industries, in a manner consistent in all material respects with Lummus's practices prior to March 15, 2005, shall be deemed part of the Lummus Ordinary Course of Business at all times.

"*Maker*" has the meaning set forth in the preamble.

"*Mandatory Prepayment*" has the meaning set forth in Section 1.3 hereof.

"*Mandatory Prepayment Date*" means, the earlier of (x) the Business Day on which a Mandatory Prepayment is made, or (y) the tenth ($10^8$) Business Date after each date on which Net Proceeds are received.

"*Net Proceeds*" means, as of any time of determination:

(A) the sum of

(i) the amount in Dollars of (x) cash proceeds received at such time, if any, plus (y) the sum of all deferred purchase price payments to be made in the future pursuant to Cash Equivalents (without discount or other deduction) which Cash Equivalents are received at such time in connection with an Asset Sale (and for the purposes of the Mandatory Prepayment Date definition, in respect of a Stock Disposition), *plus*

(ii) the aggregate amount of any Assumed Debt (including the aggregate amount of any Subordinated Intercompany Indebtedness or Exit Financing assumed by the purchaser in connection with such Asset Sale (and for the purposes of the Mandatory Prepayment Date definition, in respect of a Stock Disposition), if any), *less*

---

[7]    To be updated per merger of ABB Oil and Gas into ABB Holdings Inc., with ABB Holdings Inc. as the surviving entity.

[8]    To be updated per merger of ABB Oil and Gas into ABB Holdings Inc., with ABB Holdings Inc. as the surviving entity.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

(B) all Transaction Costs incurred by any Entities of the ABB Group through such time in respect of such Asset Sale or Stock Disposition (except to the extent such Transaction Costs have been applied to reduce previous payments of Net Proceeds).

In this definition of Net Proceeds, the term "received" means received at the time of determination by any Entity of the ABB Group or any designee of any such Entity.

"*Notice of Transaction*" means, in respect of an Asset Sale or Stock Disposition, a written notice prepared by Lummus (i) stating that an Asset Sale or Stock Disposition has occurred, (ii) describing in reasonable detail the assets or stock sold pursuant to such transaction, (iii) setting forth the amount of gross cash proceeds and Cash Equivalents resulting therefrom, (iv) setting forth the items and amounts of Transaction Costs associated therewith and otherwise reconciling in all material respects the gross cash proceeds and the Net Proceeds received as a result of such transaction; (v) setting forth any amounts described in Section 1.3(a) taken into account in the calculation of the corresponding Mandatory Prepayment; and (vi) setting forth the amount of the corresponding Mandatory Prepayment.

"*Optional Prepayment Date*" has the meaning set forth in Section 1.4.

"*Payment Date*" has the meaning set forth in Section 1.1 hereof

"*Permitted Holder*" means, as of any date of determination, the Lummus Asbestos PI Trust, or any assignee thereof that has acquired all of the interests in the Note pursuant to Section 3.15 hereof, as applicable on such date.

"*Permitted Payor*" means any Entity (other than a Maker) acting on behalf of, or designated by, a Maker, provided that such Entity can make the relevant payment without such payment being subject to rescission, avoidance, return or recovery on account of applicable fraudulent transfer, preference or other similar laws, or for any other reason.

"*Plan*" has the meaning set forth in the Glossary.

"*Pledge and Irrevocable Proxy*" means the Pledge and Irrevocable Proxy dated as of the date hereof executed by [**ABB Oil & Gas**][9] for the benefit of the Permitted Holder in the form attached as Exhibit A to the Guaranty provided by [**ABB Oil and Gas**][10].

"*Pledgor*" means the pledgor under the Pledge and Irrevocable Proxy.

"*Prime Rate*" means as of any date of determination, the "prime rate" for transactions in Dollars announced by The Wall Street Journal (National Edition).

"*Settlement Agreement*" has the meaning set forth in the preamble hereof.

"*Stock Disposition*" means a sale, transfer, assignment or other disposition (whether directly or by merger, consolidation, reorganization or otherwise) of any or all the Capital Stock of Maker by any Entity of the ABB Group (other than a sale, transfer, assignment or other disposition, by merger, consolidation, reorganization or otherwise pursuant, to which Lummus remains a direct or indirect Wholly Owned Subsidiary of ABB) or any Indirect Stock Disposition.

---

[9]     To be updated as required by the merger of ABB Oil and Gas into ABB Holdings, with ABB Holdings Inc. as the surviving entity.
[10]    To be updated per merger of ABB Oil and Gas into ABB Holdings Inc., with ABB Holdings Inc. as the surviving entity.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

"*Subordinated Intercompany Indebtedness*"[11] means the amounts owed by Lummus or any of its Subsidiaries, in respect of (i) indebtedness for borrowed money provided by ABB Treasury or any Entity of the ABB Group and in an aggregate principal amount of [**approximately $470,000,000**] which indebtedness and liabilities are identified in Exhibit B hereof, and (ii) any indebtedness and liabilities (whether fixed, matured, contingent or otherwise) existing or which may arise to any Entities of the ABB Group for or in respect of letters of credit or credit support arrangements outstanding as of the close of business of the thirty-first (31st) day immediately preceding the Petition Date provided by any such Entities, which letters of credit or credit support arrangements are identified on Exhibit C hereof, including any reimbursement or indemnity obligations or liabilities for amounts drawn or subject to being drawn after the close of business on the thirty first (31st) day immediately preceding the Petition Date hereafter under the letters of credit and other credit enhancements identified in Exhibit C.

"*Subsidiaries*" shall have the meaning set forth in the Glossary.

"*Transaction Costs*" means, in respect of an Asset Sale, the aggregate amount in Dollars of (1) the actual reasonable transaction fees, expenses and other reasonable out-of-pocket costs incurred by any Entity of the ABB Group directly relating to the relevant Asset Sale, including reasonable legal, accounting, investment banking and brokerage fees and sales commissions; and (2) direct and reasonable out-of-pocket costs and expenses incurred by any Entity of the ABB Group resulting from currency exchanges and any applicable exchange controls and other restrictions on cross-border transfers of funds relating to the relevant transaction (without duplication in respect of any such costs and expenses taken into account in the conversion of any proceeds pursuant to Section 3.3 or the determination of Net Proceeds).

"*Wholly-Owned Subsidiary*" means, with respect to any Entity as of any time of determination, any Subsidiary of such Entity 100% of the Capital Stock of which such Entity owns or controls at that time, directly or indirectly through another Subsidiary.

Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references herein to Sections, Exhibits and Schedules shall be deemed references to Sections of, and Exhibits and Schedules to, this Note unless the context shall otherwise require.

Unless otherwise indicated, the term "including" means "including without limitation", except when used in the computation of time periods.

For purposes of the computation of time periods, whenever the Note provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occurs shall not be included in the computation of days elapsed. The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" means "to and including".

[Signature page follows.]

---

[11]   The maximum amount in this definition will equal the intercompany indebtedness for borrowed money and credit support owed by Lummus and its Subsidiaries as of the close of business in New York on the thirty-first (31st) consecutive calendar day prior to the Petition Date to ABB Treasury and other ABB Entities.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

IN WITNESS WHEREOF, the Maker has duly executed this Promissory Note as of the day and year first above written.

MAKER:

ABB LUMMUS GLOBAL INC., a Delaware corporation

By: _____
Name: _____
Title: _____

Acknowledged and accepted as of                     :

ABB LUMMUS GLOBAL INC. 524(g) ASBESTOS PI TRUST,
a Delaware statutory trust

By: _____
Name: _____
Title: _____

Lummus Promissory Note Signature Page

*Exhibit A to Promissory Note*

**Schedule of Payments**

**[(assumes Dec 31, 2005 Effective Date)][12]**

| Payment No. | Payment Date | Amount of Payment |
|---|---|---|
| 1. ................................. | [Effective Date] | $  5.4 million |
| 2. ................................. | [12/31/2006] | $  2.3 million |
| 3. ................................. | [12/31/2007] | $  2.3 million |
| 4. ................................. | [12/31/2008] | $  2.3 million |
| 5. ................................. | [12/31/2009] | $  2.3 million |
| 6. ................................. | [12/31/2010] | $  2.3 million |
| 7. ................................. | [12/31/2011] | $  2.3 million |
| 8. ................................. | [12/31/2012] | $  2.3 million |
| 9. ................................. | [12/31/2013] | $  2.3 million |
| 10. ................................. | [12/31/2014] | $  2.3 million |
| 11. ................................. | [12/31/2015] | $  2.3 million |
| 12. ................................. | [12/31/2016] | $  2.3 million |
| 13. ................................. | [12/31/2017] | $  2.3 million |

---

[12]   This form of Promissory Note and the Schedule of Payments above assumes that the Effective Date occurs on or before December 30, 2005. References in the Schedule of Payments to a year are to the year indicated in each case; *provided, however,* that if the Effective Date (a) does not occur on or before December 30, 2005 and occurs during the year 2006, then each reference to a year will be deemed to be a reference to the year immediately succeeding the year indicated in each case, and (b) does not occur on or before December 31, 2006 and occurs during the year 2007, then each reference to a year will be deemed to be a reference to the second year immediately succeeding the year indicated in each case. By way of example (a) if the Effective Date does not occur on or prior to December 30, 2005 but occurs during the year 2006, then a reference to "2006" will be deemed a reference to 2007, a reference to "2007" will be deemed a

reference to 2008, etc., and (b) if the Effective Date does not occur on or prior to December 31, 2006 but occurs during the year 2007, then a reference to "2006" will be deemed a reference to year 2008, a reference to year "2007" will be deemed a reference to 2009, etc.

EXHIBIT A TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — PROMISSORY NOTE

**Exhibit B to Promissory Note**

**Intercompany Loans**

**[TO BE PROVIDED]**
**Exhibit C to Promissory Note**

**Subordinated Intercompany Indebtedness**

**[TO BE PROVIDED]**

**Exhibit B to the ABB and Non-Debtor Affiliate
Settlement Agreement**

**ABB LTD Guaranty**

## ABB LTD GUARANTY

### $33,000,000 NOTE

This ABB LTD GUARANTY (as the same may be amended, restated, supplemented or otherwise modified from time to time, this "*Guaranty*") is made as of the            , 2005, by ABB LTD, a Swiss corporation (the "*Guarantor*") in favor of the ABB LUMMUS GLOBAL INC. 524(g) ASBESTOS PI TRUST, (the "*Lummus Asbestos PI Trust*") a trust established pursuant to the Plan pursuant to §524(g) of Title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*) (the "*Bankruptcy Code*"). This Guaranty constitutes one of the "Guarantees" described and defined in the Note (as defined below) and is effective as of the Effective Date.

### W I T N E S S E T H

WHEREAS, the Guarantor has agreed to guarantee the obligations of ABB Lummus Global Inc., a Delaware corporation (the "*Maker*"), to make payments pursuant to the Promissory Note with an initial principal amount of $33,000,000 (the "*Note*") made by the Maker on the date hereof; and

WHEREAS, the Maker is a subsidiary of the Guarantor and the Maker and the Guarantor will benefit from the Plan and the consummation of the transactions contemplated thereby, including the making of the Note.

NOW THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.  *Definitions.* As used in this Guaranty, the following terms shall have the following meanings:

"*Consolidated Net Worth*" of any Entity means, as of any date of determination, the sum of all items which pursuant to the generally accepted accounting principles then applicable to the relevant Entity are included in shareholders' or owners' equity on a consolidated balance sheet of such Entity and its Subsidiaries as of such date.

"*Effective Date*" has the meaning set forth in the Glossary.

"*Entity*" has the meaning set forth in the Glossary.

"*Glossary*" means the Glossary of Terms for the Plan Documents adopted pursuant to the Plan.

"*Guaranteed Note Obligations*" means all indebtedness arising pursuant to the Note, including any costs of collection and/or enforcement of the Note pursuant to Section 2.2(iv) thereof, in accordance with its terms.

"*Guaranteed Obligations*" has the meaning set forth in Section 2(a) hereof.

"*Guaranty Expenses*" means, without duplication, all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Permitted Holder or its Representatives in connection with the collection and/or enforcement of this Guaranty.

"*Other Guaranties*" means any guaranty of the Guaranteed Obligations, other than this Guaranty.

"*Permitted Holder*" means, as of any date of determination, the "Permitted Holder" of (and as defined in) the Note as of such date.

"*Permitted Payor*" means any Entity (other than a Maker) acting on behalf of, or designated by, a Maker, provided that such Entity can make the relevant payment without such payment being subject to rescission, avoidance, return or recovery on account of applicable fraudulent transfer, preference or other similar laws, or for any other reason.

"*Plan*" means the Prepackaged Plan of Reorganization of ABB Lummus Global, Inc. as modified through August 30, 2005, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, and the exhibits, and schedules to the foregoing, as the same may be in effect from time.

"*Representatives*" has the meaning set forth in the Glossary.

"*Subsidiaries*" has the meaning set forth in the Glossary.

Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references herein to Sections, Exhibits and Schedules shall be deemed references to Sections of, and Exhibits and

Schedules to, this Guaranty unless the context shall otherwise require. The term "including" means "including without limitation", except when used in the computation of time periods.

For purposes of the computation of time periods, whenever this Guaranty provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occur shall not be included in the computation of days elapsed. The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" means "to and including".

Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Note.

2.  *Guaranty.*

(a) Guarantor hereby absolutely, irrevocably and unconditionally guarantees, as primary obligor hereunder in accordance with Article 111 of the Swiss Code of Obligations and not merely as surety and as a guarantee of payment and not merely as a guarantee of collection for the benefit of the Permitted Holder, (i) the full and prompt payment of all Guaranteed Note Obligations when due, whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter, and (ii) the due performance and compliance in its entirety, with the terms of the Note by the Maker (the obligations described in items (i) and (ii), the "*Guaranteed Obligations*"); *provided, however*, that the Guarantor will also be obligated to pay or reimburse the Permitted Holder for the Guaranty Expenses promptly upon written demand from the Permitted Holder, provided that the Permitted Holder provides the Guarantor with such supporting documentation or other appropriate evidence of the amount and nature of the Guaranty Expenses as reasonably requested by the Guarantor (but which shall not include any documentation the provision of which would result in the waiver of any applicable privilege) and any such documentation or other evidence provided by the Permitted Holder shall be presumed true, correct and complete.

(b) The Guarantor hereby agrees that this Guaranty is an absolute, unconditional guarantee of payment and performance and is not merely a surety or guaranty of collection, and that the liability for the Guaranteed Note Obligations is a continuing, absolute and unconditional obligation of payment, regardless of the solvency or insolvency of the Maker or the Guarantor at any time.

(c) Notwithstanding anything contained in this Guaranty or in the Note to the contrary, the amount guaranteed by the Guarantor hereunder shall be limited to an aggregate amount which, together with other amounts owing by the Guarantor to the Lummus Asbestos PI Trust, is equal to the largest amount that would not be subject to avoidance under Section 548 of the Bankruptcy Code or any applicable provisions of any comparable law, in particular Article 285 et seq. of the Swiss Bankruptcy Code.

3.  *Obligations Unconditional.* (a) The Guarantor hereby agrees that its obligations in respect of this Guaranty shall be enforceable against the Guarantor irrespective of:

(i) the legality, validity, enforceability, avoidance or subordination of any of the Guaranteed Obligations or the Note;

(ii) any law, regulation, or order of any jurisdiction, or any other event, affecting any term of the Guaranteed Obligations or the Note;

(iii) except as provided in Section 2(a) with respect to Guaranty Expenses, the absence of any attempt by, or on behalf of, the Permitted Holder to collect, or to take any other action to enforce, all or any part of the Guaranteed Obligations whether from or against the Maker or any other Entity;

(iv) the election of any remedy available under the Note or applicable law or in equity by, or on behalf of, the Permitted Holder with respect to all or any part of the Guaranteed Obligations;

(v) any change in the corporate existence, structure or ownership of the Maker or the Guarantor;

(vi) any impairment of the capital of the Maker or the Guarantor, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Maker, the Guarantor or their assets, or any resulting release or discharge of the Guaranteed Obligations;

(vii) any exchange, substitution, release, non-perfection or impairment of collateral (if any) securing payment of the Guaranteed Obligations; or any failure of the Permitted Holder to take any steps to perfect and maintain its security interest (if any) in, or to preserve its rights to, any security or collateral (if any) for the Guaranteed Obligations;

(viii) except as set forth in Section 3(b) of this Guaranty with respect to the creation or incurrence of new or additional indebtedness pursuant to the Note, any amendment, waiver, consent, extension, forbearance or granting of any indulgence by, or on behalf of, the Permitted Holder with respect to any provision of the Note, or any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Maker or the Guarantor, including any renewal or extension of the time or change of the manner or place of payment of the Guaranteed Obligations;

(ix) any borrowing or grant of a security interest by the Maker, as debtor-in-possession, under Section 364 of the Bankruptcy Code, or the Guarantor;

(x) the disallowance, under Section 502 of the Bankruptcy Code or any applicable provisions of any comparable law, of all or any portion of the claims against the Maker or the Guarantor held by the Permitted Holder for repayment of all or any part of the Guaranteed Obligations;

(xi) the existence of any right, claim, set-off, or defense whether arising from or relating to the Guaranteed Obligations or the Maker or otherwise, that Guarantor may have at any time against the Maker, the Permitted Holder or any other Entity, whether in connection herewith or any unrelated transactions, *provided, however*, that nothing herein shall prevent the assertion of a separate suit or compulsory counterclaim; or

(xii) the cessation for any reason of the liability of the Maker under the Note or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of the Maker or the Guarantor, except, with respect to the Guarantor, for the incurrence of new or additional indebtedness pursuant to the Note without the prior written consent as required by Section 3(b) of this Guaranty and for the requirements of Section 2(a) regarding reimbursement of Guaranty Expenses;

(xiii) any other act or circumstance which might or could be deemed a discharge or modification hereunder other than payment in full of the Guaranteed Obligations;

it being the intent of the parties to this Guaranty, except as provided in Sections 15, and 16, that the obligations of the Guarantor hereunder are absolute and unconditional under any and all circumstances.

(b) Notwithstanding Sections 3 and 4, or any other provision to the contrary in this Guaranty, any amendment, waiver, modification or change in respect of the terms and conditions of the Note resulting in the creation or incurrence of, or having the effect of creating or incurring, new or additional indebtedness (arising in any manner whatsoever, whether from increases in the principal amount of the Note, interest accrued thereunder or otherwise) shall require the prior written consent of the Guarantor.

4.   *Waivers.* (a) With respect to the Guaranteed Obligations, the Guarantor hereby waives, to the extent permitted by applicable law, acceptance, promptness, diligence, presentment, demand of payment, filing of claims with a court in the event of receivership or bankruptcy of the Maker, protest or notice, all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor and notices of acceptance of this Guaranty or the Note, the benefits of all statutes of limitation, and all other demands and defenses whatsoever (other than payment in full of all Guaranteed Obligations) (and shall not require that the same be made on the Maker as a condition to the Guarantor's obligations hereunder).

(b) Except to the extent the prior written consent of the Guarantor is required pursuant to Section 3(b) hereof and to the extent permitted by applicable law, the Permitted Holder is hereby authorized, without notice or demand and without affecting the liability of the Guarantor hereunder, by written agreement with the Maker and from time to time, (i) to renew, extend or otherwise change the time for payment of, or other terms relating to, all or any part of the Guaranteed Obligations, or to otherwise modify, amend or change the terms of the Note; (ii) to accept partial payments on all or any part of the Guaranteed Obligations; (iii) to settle, release, exchange, enforce, waive, compromise or collect or otherwise liquidate all or any part of the Guaranteed Obligations or any other guaranty of all or any part of the Guaranteed Obligations. Any of the foregoing may be done in any manner, without affecting or impairing the obligations of the Guarantor hereunder.

5.   *Payments.* All payments to be made by the Guarantor pursuant to this Guaranty shall be made in lawful currency of the United States of America by wire transfer of immediately available funds to the Permitted Holder in accordance with such wire transfer instructions that are provided by the Permitted Holder. All payments under the Guaranty shall be made in full, without any set-off or counterclaim or any deduction or withholding whatsoever, including for any and all present or future taxes. The application of payments and credits (if any) from the Guarantor, the Maker or any other Entity on account of the Guaranteed Note Obligations, shall be determined in accordance with the terms and conditions, if any, of the Note, or otherwise by the Permitted Holder.

6.  *Representations and Warranties.* The Guarantor represents and warrants, as of the Effective Date that:

(a) The Guarantor has the right, power, legal capacity and authority to execute and deliver this Guaranty. This Guaranty has been duly authorized by all necessary corporate action and has been duly executed and delivered by the Guarantor.

(b) This Guaranty is a legal, valid and binding obligation of the Guarantor enforceable in accordance with its respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings at law or in equity).

(c) The execution, delivery and performance by the Guarantor of this Guaranty does not conflict with, result in a breach of any of the provisions of, or constitute a default under, the certificate of incorporation or articles of incorporation, or the by-laws, of the Guarantor, or any other material agreement or material contract by which the Guarantor is bound or any applicable material law or material order, rule or regulation of any court or governmental agency having jurisdiction over the Guarantor.

(d) No material order, permission, consent, approval, license, authorization, registration or filing by or with any governmental agency having jurisdiction over the Guarantor is required for the execution and delivery of this Guaranty, other than for such material orders, permissions, consents, approvals, licenses, authorizations, registrations or filings that have been obtained and are in force and effect as of the date hereof.

(e) Other than with respect to (A) such actions related to the case pursuant to Chapter 11 of the Bankruptcy Code of Combustion Engineering, Inc., and (B) such actions related to the case pursuant to Chapter 11 of the Bankruptcy Code of Lummus, the Guarantor has not taken, any action, (nor to the best of its knowledge, have any steps been taken or legal proceedings been started against it) for winding-up, dissolution or reorganization, the enforcement of any security interest over its material assets or for the appointment of a receiver, administrative receiver, or administrator, trustee or similar office of it or any of its material assets.

(f) **[Guarantor has entered into a commission fee arrangement with the Maker pursuant to which it is entitled to receive from the Maker consideration for the entire term of this Guaranty for the provision of this Guaranty, the terms of which the Guarantor reasonably believes are no less favorable to Guarantor than would be obtained in a comparable arm's length transaction with a third party who is not an affiliate of Guarantor (the *"Commission Fee Agreement"*)].**

7.  *Liability for Representations and Warranties.* Notwithstanding any other provision in this Guaranty or in the Note to the contrary, the Guarantor shall not be liable for any breach of any representations and warranties made by any other guarantor of the Guaranteed Obligations.

8.  *Guarantor Covenants.* The Guarantor covenants and agrees that, from the Effective Date until all Guaranteed Obligations are indefeasibly paid and performed in full:

(a) *Affirmative Covenants.* The Guarantor shall:

(i) *Maintenance of Existence and Qualifications.* Maintain and preserve in full force and effect its existence and good standing (to the extent the concept of good standing exists in the Guarantor's jurisdiction of incorporation) and all other rights, powers, franchises, licenses and qualifications necessary or desirable for its ownership or use of properties or the conduct of its business, except (A) as permitted by Section 16 of this Guaranty, and (B) where the failure to do so would not be reasonably likely to materially and adversely affect the Guarantor's ability to carry out any of the terms and conditions of this Guaranty.

(ii) **[Commission Fee Agreement. Guarantor shall enforce any and all of its rights pursuant to the Commission Fee Agreement (if any).]**

(iii) *Information Covenants.* Furnish to the Permitted Holder

(A) *Statutory Annual Financial Statements.* As soon as available but in no event later than ninety (90) days after publication of the ABB Group audited consolidated financial statements, a consolidated balance sheet of the Guarantor and its subsidiaries as of the end of such year and consolidated statements of income, cash flows and changes in stockholders equity for such year (all in reasonable detail and with all notes and supporting schedules and to the extent the Guarantor, in its normal practice issued consolidating financial statements, such financial statements shall be

consolidating), audited by an independent certified public accountant as presenting fairly the financial condition of the Guarantor and its subsidiaries as of the dates and for the periods indicated and as having been prepared in accordance with the generally accepted accounting principles of the jurisdiction followed by the Guarantor at such time, except as may be otherwise disclosed in such financial statements or the notes thereto.

(B) *Certificate.* Simultaneously with the delivery of each annual financial statement referred to in this Section 8(a)(ii)(A), a certificate executed by an authorized officer of Guarantor certifying that the financial statements being delivered with such certificates are true, complete and correct in all material respects in accordance with the accounting principles of the jurisdiction followed by the Guarantor in effect at the time.

(b) *Negative Covenants.* The Guarantor shall not, unless the Permitted Holder shall otherwise consent in writing, sell, lease, or otherwise transfer or dispose of any assets, or consummate any other transactions that materially and adversely affect the Guarantor's ability to perform pursuant to this Guaranty, other than as permitted pursuant to Section 16 of this Guaranty.

9.    *Defaults and Remedies.*

(a) The Permitted Holder shall have the right, power and authority to do all things deemed necessary or advisable to enforce the provisions of this Guaranty and protect its interest in the Note and, upon the occurrence and during the continuance of an Event of Default, the Permitted Holder may institute or appear in such appropriate proceedings permitted or not prohibited under this Guaranty as the Permitted Holder shall deem most effectual to protect and enforce any of its rights hereunder, whether for the specific enforcement of any covenant or agreement in this Guaranty or in aid of the exercise of any power granted herein or in the Note, or to enforce any other proper remedy.

(b) Each and every Event of Default shall give rise to a separate cause of action hereunder, and separate actions may be brought hereunder as each cause of action arises. For so long as such an Event of Default is continuing, the Permitted Holder shall have the right to proceed first and directly against the Guarantor under this Guaranty without proceeding against any other Entity (including the Maker or pursuant to the Other Guaranties), without exhausting any other remedies which it may have and without resorting to any other security (if any) held by the Permitted Holder to secure the Guaranteed Obligations.

10. *Setoff.* At any time after all or any part of the Guaranteed Obligations have become due and payable (by acceleration or otherwise), the Permitted Holder may, without notice to the Guarantor and regardless of the acceptance of any security or collateral (if any) for the payment thereof, and up to the unpaid amount of the Guaranteed Obligations then due, appropriate and apply toward the payment of all or any part of the Guaranteed Obligations then owing to such Entities (i) any indebtedness due or to become due from the Permitted Holder to the Guarantor, and (ii) any moneys, credits or other property belonging to the Guarantor, at any time validly held by or coming into the possession of the Permitted Holder.

11. *Financial Information.* The Guarantor hereby acknowledges that it has adequate means of, and assumes sole responsibility for, keeping itself informed of the financial condition of the Maker and any and all other endorsers and/or other guarantors of all or any part of the Guaranteed Obligations, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations, or any part thereof, that diligent inquiry would reveal, and the Guarantor hereby agrees that the Permitted Holder shall have no duty to advise the Guarantor of information known to it regarding such condition or any such circumstances. In the event the Permitted Holder in its reasonable discretion, undertakes at any time or from time to time to provide any such information to the Guarantor, the Permitted Holder shall be under no obligation (i) to undertake any investigation not a part of its regular business routine, (ii) to disclose any information which the Permitted Holder, pursuant to accepted or reasonable practices, wishes to maintain confidential, or (iii) to make any other or future disclosures of such information or any other information to the Guarantor.

12. *Reinstatement.* Notwithstanding any provision herein to the contrary, the Guarantor agrees that, to the extent that any Entity (including any Permitted Payor) makes a payment or payments to the Permitted Holder on account of the Guaranteed Obligations or the Permitted Holder receives any proceeds of collateral (if any), securing the Guaranteed Obligations, which payments or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required or agreed to be repaid or returned by the Permitted Holder under any bankruptcy law, state or federal law, common law, or equitable cause, then, to the extent of the amount of such payments and proceeds, the portion of the Guaranteed Obligations which has been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the time immediately preceding such initial payment, reduction or satisfaction.

13. *Subrogation.* The Guarantor hereby agrees that it will not assert, enforce, or otherwise exercise any rights which it may acquire against the Maker or any guarantor pursuant to the Other Guaranties by way of subrogation pursuant to this Guaranty, by any payment made hereunder or otherwise, until the Guaranteed Obligations shall have been paid in full.

14. *Amendments; Waivers.* (a) No provision of this Guaranty may be waived, amended, supplemented or modified except by a written instrument executed by the Permitted Holder and the Guarantor.

(a) No delay on the part of the Permitted Holder in the exercise of any right or remedy arising under this Guaranty or the Note or otherwise with respect to all or any part of the Guaranteed Obligations, any collateral (if any) or any other guaranty of or security (if any) for all or any part of the Guaranteed Obligations shall operate as a waiver thereof, and no single or partial exercise by the Permitted Holder of any such right or remedy shall preclude any further exercise thereof. Failure by the Permitted Holder at any time or times hereafter to require strict performance by the Maker, the Guarantor or any other guarantor of all or any part of the Guaranteed Obligations or of any of the provisions, warranties, terms and conditions contained in the Note shall not waive, affect or diminish any right of the Permitted Holder at any time or times hereafter to demand strict performance thereof. No waiver of any Event of Default by the Permitted Holder shall operate as a waiver of any other Event of Default or the same Event of Default on a future occasion, and no action by the Permitted Holder permitted hereunder shall in any way affect or impair the Permitted Holder's rights and remedies or the obligations of the Guarantor under this Guaranty. The remedies herein provided are cumulative and not exclusive of any remedies provided by law or in equity.

15. *Effectiveness; Termination.* This Guaranty shall become effective against the Guarantor upon its execution by the Guarantor and the occurrence of the Effective Date and shall continue in full force and effect and may not be terminated or otherwise revoked, subject to Section 12 hereof, until the Guaranteed Obligations shall have been paid in full.

16. *Consolidation, Successors and Assigns.*

(a) This Guaranty shall be binding upon the Guarantor and upon the successors and permitted assigns of the Guarantor and shall inure to the benefit of the Permitted Holder. The successors and assigns of the Guarantor and the Maker shall include, without limitation, their respective receivers, trustees or debtors-in-possession.

(b) Neither the Lummus Asbestos PI Trust nor any Permitted Holder may assign this Guaranty without the prior written consent of the Guarantor, such consent not to be unreasonably withheld, conditioned or delayed; *provided, however,* that if the Lummus Asbestos PI Trust or a Permitted Holder, as applicable, assigns the Note in accordance with its terms, the Guaranty may be assigned to the assignee of the Note without the consent of the Guarantor.

(c) The Guarantor may not assign or transfer its rights or obligations under this Guaranty without the prior written consent of the Permitted Holder, which consent may be withheld, conditioned, delayed or denied by the Permitted Holder in its sole discretion.

(d) Notwithstanding the preceding paragraph, however, neither such sentence nor anything else in this Guaranty shall restrict at any time the ability of the Guarantor to merge with or into, sell all or substantially all of its assets to, or otherwise consolidate with or into, any Entity which immediately following such transaction, is a direct or indirect Wholly Owned Subsidiary of ABB, *provided, however,* that prior to and immediately after such transaction (unless the Permitted Holder consents otherwise in writing) (i) if the Guarantor is an Entity organized under the laws of a state of the United States of America or the District of Columbia (a "*Domestic Entity*"), the surviving or succeeding Entity (which includes any Entity to which all or substantially all of the assets of the Guarantor have been transferred) is a Domestic Entity, or if the Guarantor is an Entity other than a Domestic Entity (a "*Foreign Entity*"), then the surviving or succeeding Entity (which includes any Entity to which all or substantially all of the assets of the Guarantor have been transferred) may be a Domestic Entity or a Foreign Entity; (ii) the surviving or succeeding Entity shall have, after giving effect to the relevant transaction, a Consolidated Net Worth equal to or greater than the Consolidated Net Worth of the Guarantor, (iii) no Event of Default and, no event which, with the giving of notice or the passage of time, would constitute an Event of Default, shall exist immediately following the consummation of such transaction; (iv) such transaction does not conflict with, or result in a breach of, any of the provisions of, or constitute a default under, the certificate of incorporation or the by-laws of the Guarantor or such surviving or succeeding Entity or any other material agreement or material contract by which the Guarantor or such surviving or succeeding Entity is bound or any applicable law, or any applicable order, rule or regulation of any court or governmental agency having jurisdiction; (v) the consummation of such transaction shall not materially impair the Guarantor's ability to perform pursuant to this Guaranty, (vi) at least 10 days prior to consummation of such transaction, the Guarantor shall deliver to the Permitted Holder written notice of its intent to consummate such transaction, and (vii) at the closing of such transaction, the surviving or succeeding Entity shall deliver, or cause to be delivered, to the Permitted Holder a certificate from the chief executive officer, chief operating officer, or chief financial officer of such Entity to the effect that such officer has reviewed this Guaranty for purposes of giving such certificate, that such officer is familiar with the facts related to the transaction being consummated and that such officer certifies that such transaction complies in all material respects with the provisions of this Section 16 and is being undertaken for a valid business purpose.

(e) Prior to, or concurrently with, the consummation of any such merger, sale of assets or consolidation pursuant to Section 16(d), as applicable, the surviving or succeeding Entity shall by written instrument in form and substance reasonably acceptable to the Permitted Holder expressly assume the rights and obligations of the Guarantor hereunder, whereupon such Entity shall be the successor of all rights and obligations of the original Guarantor hereunder, with the same effect as if it had been originally named herein; provided, however, that the Guarantor shall not be discharged from, and shall remain liable for, any and all obligations and liabilities under this Guaranty.

(f) The Guarantor shall be responsible for and shall pay upon demand all reasonable costs and expenses incurred by the Permitted Holder (including reasonable legal fees and expenses) in connection with the transactions proposed by the Guarantor pursuant to Section 17 (d) (whether or not such transaction is in fact consummated).

(g) Any assignment or transfer in breach of this Section 16 shall be null and void and not transfer any interest in this Guaranty to any other Entity.

17. *Governing Law.* THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF SWITZERLAND.

18. *Jurisdiction.* With respect to all claims or disputes under this Guaranty, all such claims or disputes shall be resolved at the sole election of the Lummus Asbestos PI Trust (A) if by a court, exclusively by the Commercial Court of the Canton of Zurich, Switzerland, except to such extent that Guarantor may waive its right to the exclusive jurisdiction of such a Swiss court and elect or consent, in writing, to the jurisdiction of the Bankruptcy Court (as defined in the Note), provided that to the extent that the Bankruptcy Court is not permitted under applicable law to exercise jurisdiction with respect to the matter in question, then to the extent that Guarantor elects or consents, in writing, to the jurisdiction of the federal and state courts in the state, county and city of New York, New York or (B) pursuant to binding arbitration under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with said Rules (with proceedings conducted in London).

For the avoidance of doubt, it is the parties intent that nothing in this Guaranty (including this Section 18) shall have the effect of submitting any Entity of the ABB Group other than the Guarantor and the Permitted Holder (including any other Entity of the ABB Group organized under the laws of a jurisdiction other than the laws of a state of the United States) to the laws of the State of New York the State of Delaware, the laws of the United States or the jurisdiction of the Courts or other court exercising United States federal or state jurisdiction.

19. *Advice of Counsel.* The Guarantor and the Lummus Asbestos PI Trust represent and warrant to the other that it has analyzed this Guaranty with, and has been advised as to its legal effects by, its legal counsel.

20. *Notices.* All notices required or permitted under this Guaranty must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Service, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the third business day next following the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this Section 20);

| **If to Guarantor:** | *With copies* | Kirkland & Ellis LLP |
|---|---|---|
| ABB Ltd | *to, which* | Citigroup Center |
| Affolternstrasse 44 | *shall not* | 153 E. 53rd Street |
| CH-8050 Zürich | *constitute* | New York, NY 10022-4675 |
| Switzerland | *notice:* | Attn: Theodore L. Freedman |
| | | Facsimile: (212) 446-4900 |

Attn: General Counsel
Facsimile: (41) 43-317-79-92

21. *Severability.* Wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

22. *Entire Agreement.* This Guaranty represents the final agreement of the Guarantor and the Lummus Asbestos PI Trust with respect to the matters contained herein and may not be contradicted by evidence of prior or contemporaneous agreements between the Guarantor and the Lummus Asbestos PI Trust.

23.  *English Language.* This Guaranty is executed and shall be construed in the English language, and the English language version shall prevail over all others. All instruments, agreements, certificates, opinions and other documents to be furnished or communications to be given or made under the Guaranty shall be in the English language, except that the annual financial statements provided pursuant to Section 8(a)(ii)(A) shall be provided in the language such financial statements are normally prepared by the Guarantor.

24.  *Execution in Counterparts.* This Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

[signature pages follow]

IN WITNESS WHEREOF, this Guaranty has been duly executed by the Guarantor as of the day and year first set forth above.

ABB LTD

By _____
Name:
Title:

Acknowledged and agreed to
as of the    day of    ,    .

ABB LUMMUS GLOBAL INC. 529 (g) ASBESTOS PI TRUST

By: _____
Name:
Title:

**Exhibit B to the ABB and Non-Debtor Affiliate Settlement Agreement (Continued)**

**ABB Oil and Gas USA Inc. Guaranty**

### [ABB OIL AND GAS USA INC.]¹ GUARANTY

#### $33,000,000 NOTE

This [**ABB OIL AND GAS USA INC.**]² GUARANTY (as the same may be amended, restated, supplemented or otherwise modified from time to time, this "*Guaranty*") is made as of the              , 2005, by [**ABB Oil and Gas USA Inc.**]³, a Delaware corporation (the "*Guarantor*") in favor of the ABB LUMMUS GLOBAL INC. 524(g) ASBESTOS PI TRUST, (the "*Lummus Asbestos PI Trust*") a trust established pursuant to the Plan (as defined below) pursuant to §524(g) of Title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*) (the "*Bankruptcy Code*"). This Guaranty constitutes one of the "Guarantees" described and defined in the Note and is effective as of the Effective Date.

#### W I T N E S S E T H

WHEREAS, the Guarantor has agreed to guarantee the obligations of ABB Lummus Global Inc., a Delaware corporation (the "*Maker*"), to make payments pursuant to the Promissory Note with an initial principal amount of $33,000,000 (the "*Note*") made by the Maker on the date hereof; and

WHEREAS, the Maker is a subsidiary of the Guarantor and the Maker and the Guarantor will benefit from the Plan and the consummation of the transactions contemplated thereby, including the making of the Note.

NOW THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. *Definitions.* As used in this Guaranty, the following terms shall have the following meanings:

"*ABB Ltd*" means ABB Ltd, a Swiss corporation.

"*Consolidated Net Worth*" of any Entity means, as of any date of determination, the sum of all items which pursuant to the generally accepted accounting principles then applicable to the relevant Entity are included in shareholders' or owners' equity on a consolidated balance sheet of such Entity and its Subsidiaries as of such date.

"*Effective Date*" has the meaning set forth in the Glossary.

"*Entity*" has the meaning set forth in the Glossary.

"*Glossary*" means the Glossary of Terms for the Plan Documents, adopted pursuant to the Plan.

"*Guaranteed Note Obligations*" means all indebtedness arising pursuant to the Note, including any costs of collection and/or enforcement of the Note pursuant to Section 2.2(iv) thereof, in accordance with its terms.

---

¹   To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.
²   To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.
³   To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

"*Guaranteed Obligations*" has the meaning set forth in Section 2(a) hereof.

"*Guaranty Expenses*" means, without duplication, all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Permitted Holder or its Representatives in connection with the collection and/or enforcement of this Guaranty.

"*Other Guaranties*" means any guaranty of the Guaranteed Obligations, other than this Guaranty.

"*Permitted Holder*" means, as of any date of determination, the "Permitted Holder" of (and as defined in) the Note as of such date.

"*Plan*" means the Prepackaged Plan of Reorganization of ABB Lummus Global Inc. as modified through August 30, 2005, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, and the exhibits, and schedules to the foregoing, as the same may be in effect from time.

"*Pledge and Irrevocable Proxy*" means the Pledge and Irrevocable Proxy executed by the Guarantor in favor of the Lummus Asbestos PI Trust of even date herewith in the form annexed as Exhibit A hereto.

"*Representatives*" has the meaning set forth in the Glossary.

"*Subsidiaries*" has the meaning set forth in the Glossary.

Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references herein to Sections, Exhibits and Schedules shall be deemed references to Sections of, and Exhibits and Schedules to, this Guaranty unless the context shall otherwise require. The term "including" means "including without limitation", except when used in the computation of time periods.

For purposes of the computation of time periods, whenever this Guaranty provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occur shall not be included in the computation of days elapsed. The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" means "to and including".

Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Note.

2.  *Guaranty.*

(a) For value received and in consideration of the transactions set forth in the Note and in the Plan, the Guarantor hereby absolutely, irrevocably and unconditionally guarantees for the benefit of the Permitted Holder, as a primary obligor and not merely as a surety, and pursuant to the terms and conditions of this Guaranty, (i) the full and prompt payment of all Guaranteed Note Obligations when due, whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter, and (ii) the due performance and compliance, in its entirety, with the terms of the Note by the Maker (the obligations described in items (i) and (ii), the "*Guaranteed Obligations*"); *provided, however*, that the Guarantor will also be obligated to pay or reimburse the Permitted Holder for the Guaranty Expenses promptly upon written demand from the Permitted Holder, provided that the Permitted Holder provides the Guarantor with such supporting documentation or other appropriate evidence of the amount and nature of the Guaranty Expenses as reasonably requested by the Guarantor (but which shall not

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

include any documentation the provision of which would result in the waiver of any applicable privilege) and any such documentation or other evidence provided by the Permitted Holder shall be presumed true, correct and complete.

(b) The Guarantor hereby agrees that this Guaranty is an absolute, unconditional guarantee of payment and performance and is not merely a surety or guaranty of collection, and that the Guarantor and the Maker are jointly and severally liable for the Guaranteed Note Obligations, which liability is a continuing, absolute and unconditional obligation of payment, regardless of the solvency or insolvency of the Maker or the Guarantor at any time.

(c) Notwithstanding anything contained in this Guaranty or in the Note to the contrary, the amount guaranteed by the Guarantor hereunder shall be limited to an aggregate amount which, together with other amounts owing by the Guarantor to the Lummus Asbestos PI Trust, is equal to the largest amount that would not be subject to avoidance under Section 548 of the Bankruptcy Code or any applicable provisions of any comparable state law.

3.  *Obligations Unconditional.* (a) The Guarantor hereby agrees that its obligations in respect of this Guaranty shall be enforceable against the Guarantor irrespective of:

(i) the legality, validity, enforceability, avoidance or subordination of any of the Guaranteed Obligations or the Note;

(ii) any law, regulation, or order of any jurisdiction, or any other event, affecting any term of the Guaranteed Obligations or the Note;

(iii) except as provided in Section 2(a) with respect to Guaranty Expenses, the absence of any attempt by, or on behalf of, the Permitted Holder to collect, or to take any other action to enforce, all or any part of the Guaranteed Obligations whether from or against the Maker or any other Entity;

(iv) the election of any remedy available under the Note or applicable law or in equity by, or on behalf of, the Permitted Holder with respect to all or any part of the Guaranteed Obligations;

(v) any change in the corporate existence, structure or ownership of the Maker or the Guarantor;

(vi) any impairment of the capital of the Maker or the Guarantor, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Maker, the Guarantor or their assets, or any resulting release or discharge of the Guaranteed Obligations;

(vii) any exchange, substitution, release, non-perfection or impairment of collateral (if any) securing payment of the Guaranteed Obligations; or any failure of the Permitted Holder to take any steps to perfect and maintain its security interest (if any) in, or to preserve its rights to, any security or collateral (if any) for the Guaranteed Obligations;

(viii) except as set forth in Section 3(b) of this Guaranty with respect to the creation or incurrence of new or additional indebtedness pursuant to the Note, any amendment, waiver, consent, extension, forbearance or granting of any indulgence by, or on behalf of, the Permitted Holder with respect to any provision of the Note, or any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Maker or the Guarantor, including any renewal or extension of the time or change of the manner or place of payment of the Guaranteed Obligations;

(ix) any borrowing or grant of a security interest by the Maker or the Guarantor, as debtor-in-possession, under Section 364 of the Bankruptcy Code;

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

(x) the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of the claims against the Maker or the Guarantor held by the Permitted Holder for repayment of all or any part of the Guaranteed Obligations;

(xi) the existence of any right, claim, set-off, or defense whether arising from or relating to the Guaranteed Obligations or the Maker or otherwise, that Guarantor may have at any time against the Maker, the Permitted Holder or any other Entity, whether in connection herewith or any unrelated transactions, *provided, however*, that nothing herein shall prevent the assertion of a separate suit or compulsory counterclaim; or

(xii) the cessation for any reason of the liability of the Maker under the Note or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of the Maker or the Guarantor, except, with respect to the Guarantor, for the incurrence of new or additional indebtedness pursuant to the Note without the prior written consent as required by Section 3(b) of this Guaranty and for the requirements of Section 2(a) regarding reimbursement of Guaranty Expenses;

(xiii) any other act or circumstance which might or could be deemed a discharge or modification hereunder other than payment in full of the Guaranteed Obligations;

it being the intent of the parties to this Guaranty, except as provided in Section 17, that the obligations of the Guarantor hereunder are absolute and unconditional under any and all circumstances.

(b) Notwithstanding Sections 3 and 4, or any other provision to the contrary in this Guaranty, any amendment, waiver, modification or change in respect of the terms and conditions of the Note resulting in the creation or incurrence of, or having the effect of creating or incurring, new or additional indebtedness (arising in any manner whatsoever, whether from increases in the principal amount of the Note, interest accrued thereunder or otherwise) shall require the prior written consent of the Guarantor.

4.  *Waivers.* (a) With respect to the Guaranteed Obligations, the Guarantor hereby waives acceptance, promptness, diligence, presentment, demand of payment, filing of claims with a court in the event of receivership or bankruptcy of the Maker, protest or notice, all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor and notices of acceptance of this Guaranty or the Note, the benefits of all statutes of limitation, and all other demands and defenses whatsoever (other than payment in full of all

Guaranteed Obligations) (and shall not require that the same be made on the Maker as a condition to the Guarantor's obligations hereunder).

(b) Except to the extent the prior written consent of the Guarantor is required pursuant to Section 3(b) hereof, the Permitted Holder is hereby authorized, without notice or demand and without affecting the liability of the Guarantor hereunder, by written agreement with the Maker and from time to time, (i) to renew, extend or otherwise change the time for payment of, or other terms relating to, all or any part of the Guaranteed Obligations, or to otherwise modify, amend or change the terms of the Note; (ii) to accept partial payments on all or any part of the Guaranteed Obligations; (iii) to settle, release, exchange, enforce, waive, compromise or collect or otherwise liquidate all or any part of the Guaranteed Obligations or any other guaranty of all or any part of the Guaranteed Obligations. Any of the foregoing may be done in any manner, without affecting or impairing the obligations of the Guarantor hereunder.

5.  *Payments.* All payments to be made by the Guarantor pursuant to this Guaranty shall be made in lawful currency of the United States of America by wire transfer of immediately available funds to the Permitted Holder in accordance with such wire transfer instructions that are provided by the Permitted Holder. All payments under the

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

Guaranty shall be made in full, without any set-off or counterclaim or any deduction or withholding whatsoever, including for any and all present or future taxes. The application of payments and credits (if any) from the Guarantor, the Maker or any other Entity on account of the Guaranteed Note Obligations, shall be determined in accordance with the terms and conditions, if any, of the Note, or otherwise by the Permitted Holder.

6.  *Representations and Warranties.* The Guarantor represents and warrants, as of the Effective Date that:

(a) The Guarantor has the right, power, legal capacity and authority to execute and deliver this Guaranty. This Guaranty has been duly authorized by all necessary corporate action and has been duly executed and delivered by the Guarantor.

(b) This Guaranty is a legal, valid and binding obligation of the Guarantor enforceable in accordance with its respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings at law or in equity).

(c) The execution, delivery and performance by the Guarantor of this Guaranty does not conflict with, result in a breach of any of the provisions of, or constitute a default under, the certificate of incorporation or articles of incorporation, or the by-laws, of the Guarantor, or any other material agreement or material contract by which the Guarantor is bound or any applicable material law or material order, rule or regulation of any court or governmental agency having jurisdiction over the Guarantor.

(d) No material order, permission, consent, approval, license, authorization, registration or filing by or with any governmental agency having jurisdiction over the Guarantor is required for the execution and delivery of this Guaranty, other than for such material orders, permissions, consents, approvals, licenses, authorizations, registrations or filings that have been obtained and are in force and effect as of the date hereof.

(e) Other than with respect to (A) such actions related to the case pursuant to Chapter 11 of the Bankruptcy Code of Combustion Engineering, Inc., and (B) such actions related to the case pursuant to Chapter 11 of the Bankruptcy Code of Lummus, the Guarantor has not taken, any action, (nor to the best of its knowledge, have any steps been taken or legal proceedings been started against it) for winding-up, dissolution or reorganization, the enforcement of any security interest over its material assets or for the appointment of a receiver, administrative receiver, or administrator, trustee or similar office of it or any of its material assets.

7.  *Liability for Representations and Warranties.* Notwithstanding any other provision in this Guaranty or in the Note to the contrary, the Guarantor shall not be liable for any breach of any representations and warranties made by any other guarantor of the Guaranteed Obligations.

8.  *Guarantor Covenants.* The Guarantor covenants and agrees that, from the Effective Date until all Guaranteed Obligations are indefeasibly paid and performed in full:

(a) *Affirmative Covenants.* The Guarantor shall:

(i) *Maintenance of Existence and Qualifications*. Maintain and preserve in full force and effect its existence and good standing (to the extent the concept of good standing exists in the Guarantor's jurisdiction of incorporation) and all other rights, powers, franchises, licenses and qualifications necessary or desirable for its ownership or use of properties or the conduct of its business, except (A) as permitted by Section 17 of this Guaranty, and (B) where the failure to do so would not be reasonably likely to materially and adversely affect the Guarantor's ability to carry out any of the terms and conditions of this Guaranty.

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

(ii) *Information Covenants*. Furnish to the Permitted Holder

(A) *Annual Financial Statements*. As soon as available but in no event later than ninety (90) days after publication of the ABB Group audited consolidated financial statements, a consolidated balance sheet of the Guarantor and its subsidiaries as of the end of such year and consolidated statements of income, cash flows and changes in stockholders equity for such year (all in reasonable detail and with all notes and supporting schedules and to the extent the Guarantor, in its normal practice issued consolidating financial statements, such financial statements shall be consolidating), audited by an independent certified public accountant as presenting fairly the financial condition of the Guarantor and its subsidiaries as of the dates and for the periods indicated and as having been prepared in accordance with the generally accepted accounting principles of the jurisdiction followed by the Guarantor at such time, except as may be otherwise disclosed in such financial statements or the notes thereto.

(B) *Certificate*. Simultaneously with the delivery of each annual financial statement referred to in this Section 8(a)(ii)(A), a certificate executed by an authorized officer of Guarantor certifying that the financial statements being delivered with such certificates are true, complete and correct in all material respects in accordance with the accounting principles of the jurisdiction followed by the Guarantor in effect at the time.

(b) *Negative Covenants*. The Guarantor shall not, unless the Permitted Holder shall otherwise consent in writing sell, lease, or otherwise transfer or dispose of any assets, or consummate any other transactions that materially and adversely affect the Guarantor's ability to perform pursuant to this Guaranty, other than as permitted pursuant to Section 17 of this Guaranty.

9. *Defaults and Remedies.*

(a) The Permitted Holder shall have the right, power and authority to do all things deemed necessary or advisable to enforce the provisions of this Guaranty and protect its interest in the Note and, upon the occurrence and during the continuance of an Event of Default, the Permitted Holder may institute or appear in such appropriate proceedings permitted or not prohibited under this Guaranty as the Permitted Holder shall deem most effectual to protect and enforce any of its rights hereunder, whether for the specific enforcement of any covenant or agreement in this Guaranty or in aid of the exercise of any power granted herein or in the Note, or to enforce any other proper remedy.

(b) Each and every Event of Default shall give rise to a separate cause of action hereunder, and separate actions may be brought hereunder as each cause of action arises. For so long as such an Event of Default is continuing, the Permitted Holder shall have the right to proceed first and directly against the Guarantor under this Guaranty without proceeding against any other Entity (including the Maker or pursuant to the Other Guaranties), without exhausting any other remedies which it may have and without resorting to any other security (if any) held by the Permitted Holder to secure the Guaranteed Obligations.

10. *Setoff*. At any time after all or any part of the Guaranteed Obligations have become due and payable (by acceleration or otherwise), the Permitted Holder may, without notice to the Guarantor and regardless of the acceptance of any security or collateral (if any) for the payment thereof, and up to the unpaid amount of the Guaranteed Obligations then due, appropriate and apply toward the payment of all or any part of the Guaranteed Obligations then owing to such Entities (i) any indebtedness due or to become due from the Permitted Holder to the Guarantor, and (ii) any moneys, credits or other property belonging to the Guarantor, at any time validly held by or coming into the possession of the Permitted Holder.

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

11. *Financial Information*. The Guarantor hereby acknowledges that it has adequate means of, and assumes sole responsibility for, keeping itself informed of the financial condition of the Maker and any and all other endorsers and/or other

guarantors of all or any part of the Guaranteed Obligations, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations, or any part thereof, that diligent inquiry would reveal, and the Guarantor hereby agrees that the Permitted Holder shall have no duty to advise the Guarantor of information known to it regarding such condition or any such circumstances. In the event the Permitted Holder in its reasonable discretion, undertakes at any time or from time to time to provide any such information to the Guarantor, the Permitted Holder shall be under no obligation (i) to undertake any investigation not a part of its regular business routine, (ii) to disclose any information which the Permitted Holder, pursuant to accepted or reasonable practices, wishes to maintain confidential, or (iii) to make any other or future disclosures of such information or any other information to the Guarantor.

12. *Reinstatement*. Notwithstanding any provision herein to the contrary, the Guarantor agrees that, to the extent that any Entity (including any Permitted Payor) makes a payment or payments to the Permitted Holder on account of the Guaranteed Obligations or the Permitted Holder receives any proceeds of collateral (if any), securing the Guaranteed Obligations, which payments or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required or agreed to be repaid or returned by the Permitted Holder under any bankruptcy law, state or federal law, common law, or equitable cause, then, to the extent of the amount of such payments and proceeds, the portion of the Guaranteed Obligations which has been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the time immediately preceding such initial payment, reduction or satisfaction.

13. *Pledge*. Guarantor shall pledge 51% of the Capital Stock of the Maker to the Lummus Asbestos PI Trust pursuant to, and in accordance with, the terms of the Pledge and Irrevocable Proxy which Guarantor shall execute and deliver to the Lummus Asbestos PI Trust concurrently with the execution and delivery of this Guaranty.

14. *Subrogation*. The Guarantor hereby agrees that it will not assert, enforce, or otherwise exercise any rights which it may acquire against the Maker or any guarantor pursuant to the Other Guaranties by way of subrogation pursuant to this Guaranty, by any payment made hereunder or otherwise, until the Guaranteed Obligations shall have been paid in full.

15. *Amendments; Waivers*. (a) No provision of this Guaranty may be waived, amended, supplemented or modified except by a written instrument executed by the Permitted Holder and the Guarantor.

(b) No delay on the part of the Permitted Holder in the exercise of any right or remedy arising under this Guaranty or the Note or otherwise with respect to all or any part of the Guaranteed Obligations, any collateral (if any) or any other guaranty of or security (if any) for all or any part of the Guaranteed Obligations shall operate as a waiver thereof, and no single or partial exercise by the Permitted Holder of any such right or remedy shall preclude any further exercise thereof. Failure by the Permitted Holder at any time or times hereafter to require strict performance by the Maker, the Guarantor or any other guarantor of all or any part of the Guaranteed Obligations or of any of the provisions, warranties, terms and conditions contained in the Note shall not waive, affect or diminish any right of the Permitted Holder at any time or times hereafter to demand strict performance thereof. No waiver of any Event of Default by the Permitted Holder shall operate as a waiver of any other Event of Default or the same Event of Default on a future occasion, and no action by the Permitted Holder permitted hereunder shall in any way affect or impair the Permitted Holder's rights and remedies or the obligations of the Guarantor under this Guaranty. The remedies herein provided are cumulative and not exclusive of any remedies provided by law or in equity.

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

16. *Effectiveness; Termination*. This Guaranty shall become effective against the Guarantor upon its execution by the Guarantor and the occurrence of the Effective Date and shall continue in full force and effect and may not be terminated or otherwise revoked, subject to Section 12 hereof, until the Guaranteed Obligations shall have been paid in full.

17. *Consolidation, Successors and Assigns*.

(a) This Guaranty shall be binding upon the Guarantor and upon the successors and permitted assigns of the Guarantor and shall inure to the benefit of the Permitted Holder. The successors and assigns of the Guarantor and the Maker shall include, without limitation, their respective receivers, trustees or debtors-in-possession.

(b) Neither the Lummus Asbestos PI Trust nor any Permitted Holder may assign this Guaranty without the prior written consent of the Guarantor, such consent not to be unreasonably withheld, conditioned or delayed; *provided, however*, that if the Lummus Asbestos PI Trust or a Permitted Holder, as applicable, assigns the Note in accordance with its terms, the Guaranty may be assigned to the assignee of the Note without the consent of the Guarantor.

(c) The Guarantor may not assign or transfer its rights or obligations under this Guaranty without the prior written consent of the Permitted Holder, which consent may be withheld, conditioned, delayed or denied by the Permitted Holder in its sole discretion.

(d) Notwithstanding the preceding paragraph, however, neither such sentence nor anything else in this Guaranty shall restrict at any time the ability of the Guarantor to merge with or into, sell all or substantially all of its assets to, or otherwise consolidate with or into, any Entity which immediately following such transaction, is a direct or indirect Wholly Owned Subsidiary of ABB, *provided, however*, that prior to and immediately after such transaction (unless the Permitted Holder consents otherwise in writing) (i) if the Guarantor is an Entity organized under the laws of a state of the United States of America or the District of Columbia (a "*Domestic Entity*"), the surviving or succeeding Entity (which includes any Entity to which all or substantially all of the assets of the Guarantor have been transferred) is a Domestic Entity, or if the Guarantor is an Entity other than a Domestic Entity (a "*Foreign Entity*"), then the surviving or succeeding Entity (which includes any Entity to which all or substantially all of the assets of the Guarantor have been transferred) may be a Domestic Entity or a Foreign Entity; (ii) the surviving or succeeding Entity shall have, after giving effect to the relevant transaction, a Consolidated Net Worth equal to or greater than the Consolidated Net Worth of the Guarantor, (iii) no Event of Default and, no event which, with the giving of notice or the passage of time, would constitute and Event of Default, shall exist immediately following the consummation of such transaction; (iv) such transaction does not conflict with, or result in a breach of, any of the provisions of, or constitute a default under, the certificate of incorporation or the by-laws of the Guarantor or such surviving or succeeding Entity or any other material agreement or material contract by which the Guarantor or such surviving or succeeding Entity is bound or any applicable law, or any applicable order, rule or regulation of any court or governmental agency having jurisdiction; (v) the consummation of such transaction shall not materially impair the Guarantor's ability to perform pursuant to this Guaranty, (vi) at least 10 days prior to consummation of such transaction, the Guarantor shall deliver to the Permitted Holder written notice of its intent to consummate such transaction, and (vii) at the closing of such transaction, the surviving or succeeding Entity shall deliver, or cause to be delivered, to the Permitted Holder a certificate from the chief executive officer, chief operating officer, or chief financial officer of such Entity to the effect that such officer has reviewed this Guaranty for purposes of giving such certificate, that such officer is familiar with the facts related to the transaction being consummated and that such officer certifies that such transaction complies in all material respects with the provisions of this Section 17 and is being undertaken for a valid business purpose.

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

(e) Prior to, or concurrently with, the consummation of any such merger, sale of assets or consolidation pursuant to Section 17(d), as applicable, the surviving or succeeding Entity shall by written instrument in form and substance reasonably acceptable to the Permitted Holder expressly assume the rights and obligations of the Guarantor hereunder, whereupon such Entity shall be the successor of all rights and obligations of the original Guarantor hereunder, with the same effect as if it had been originally named herein; provided, however, that the Guarantor shall not be discharged from, and shall remain liable for, any and all obligations and liabilities under this Guaranty.

(f) The Guarantor shall be responsible for and shall pay upon demand all reasonable costs and expenses incurred by the Permitted Holder (including reasonable legal fees and expenses) in connection with the transactions proposed by the Guarantor pursuant to Section 17 (d) (whether or not such transaction is in fact consummated).

(g) Any assignment or transfer in breach of this Section 17 shall be null and void and not transfer any interest in this Guaranty to any other Entity.

18.   *Governing Law.* THIS GUARANTY SHALL BE INTERPRETED, AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK.

19.   *Jurisdiction.* With respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Guaranty (such claims, suits, actions, proceedings, and other disputes, the "*Claims*") against the Guarantor, the Guarantor hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware (the "*Courts*"), or, if both such Courts are not permitted under applicable law to exercise jurisdiction with respect to the matter in question, then at the sole election of the Permitted Holder, to the jurisdiction of any other federal or state court in the state, county and city of New York, New York and in the County of New Castle or the city of Wilmington, Delaware.

Subject to the preceding paragraph, the Guarantor and the Permitted Holder hereby (a) submit to the jurisdiction of the courts as and for the limited purpose described above, and (b) agree that any and all Claims may be brought, heard and determined in such courts.

The Guarantor and the Permitted Holder agree that venue shall be proper in such courts and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such courts, including any of the foregoing based upon the doctrine of *forum non conveniens*. The Guarantor and the Permitted Holder hereby agree that all process which may be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such suit, action, proceeding, claim or dispute) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under this Note and shall be deemed in every respect effective service of process upon such party when so given.

20.   *Advice of Counsel.* The Guarantor and the Lummus Asbestos PI Trust represent and warrant to the other that it has analyzed this Guaranty with, and has been advised as to its legal effects by, its legal counsel.

21.   *Notices.* All notices required or permitted under this Guaranty must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Service, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the third business day next following the day when placed in

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this Section 21); provided that to be effective any notice to Guarantor hereunder must also be given to ABB Ltd:

| If to Guarantor: | With copies to, which shall not | ABB Ltd |
|---|---|---|
| [ABB Oil and Gas USA Inc.][4] | *constitute notice:* | |
| 501 Merritt 7, 6th Floor | | ABB Ltd |
| P.O. Box 5308 | | Affolternstrasse 44 |
| Norwalk, CT 06856-5308 | | CH-8050 Zürich |
| Attn: General Counsel/Chief | | Switzerland |
| Financial Officer | | |
| Facsimile: (203) 750-2307 | | Attn: General Counsel |
| *(if sending overnight packages use zip* | | Facsimile: (41) 43-317-79-92 |
| *code 06851)* | | |
| | | Kirkland & Ellis LLP |
| | | Citigroup Center |
| | | 153 E. 53rd Street |
| | | New York, NY 10022-4675 |
| | | Attn: Theodore L. Freedman Facsimile: |
| | | (212) 446-4900 |

22.   *Severability.* Wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

23.   *Entire Agreement.* This Guaranty represents the final agreement of the Guarantor and the Lummus Asbestos PI Trust with respect to the matters contained herein and may not be contradicted by evidence of prior or contemporaneous agreements between the Guarantor and the Lummus Asbestos PI Trust.

24.   *English Language.* This Guaranty is executed and shall be construed in the English language, and the English language version shall prevail over all others. All instruments, agreements, certificates, opinions and other documents to be furnished or communications to be given or made under the Guaranty shall be in the English language, except that the annual financial statements provided pursuant to Section 8(a)(ii)(A) shall be provided in the language such financial statements are normally prepared by the Guarantor.

25. *Execution in Counterparts.* This Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

[signature pages follow]

---

[4]    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB OIL AND GAS USA INC.
GUARANTY

IN WITNESS WHEREOF, this Guaranty has been duly executed by the Guarantor as of the day and year first set forth above.

**[ABB OIL AND GAS USA INC.][5]**

By _____
Name:
Title:

Acknowledged and agreed to
as of the    day of    ,    .

ABB LUMMUS GLOBAL INC. 524(g) ASBESTOS PI TRUST

By: _____
Name:
Title:

---

[5]    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

### EXHIBIT A TO ABB LTD GUARANTY

### PLEDGE AND IRREVOCABLE PROXY[6]

---

[6]    To be included only in the Guaranty to be provided by ABB Oil and Gas USA Inc.

## PLEDGE AND IRREVOCABLE PROXY

THIS PLEDGE AND IRREVOCABLE PROXY (this *"Pledge Agreement"*) is made as of                , 2005, by **[ABB Oil and Gas USA Inc.]**[1], a Delaware corporation (*"ABB Oil and Gas"* or the *"Pledgor"*), in favor of the ABB Global Lummus Inc. 524(g) Asbestos PI Trust, (the *"Lummus Asbestos PI Trust"*).

### W I T N E S S E T H :

WHEREAS, the Pledgor, ABB Ltd, a corporation organized and existing under the laws of Switzerland (*"ABB"*), ABB Holdings Inc., a Delaware corporation (*"ABB Holdings"*), a successor in interest by merger to Asea Brown Boveri Inc., ABB Lummus Global Inc., a Delaware corporation (*"Lummus"* or the *"Debtor"*) and a wholly owned subsidiary of ABB Holdings, Richard B. Schiro as the Lummus Future Claimants' Representative, and the Lummus Asbestos PI Trust entered into the ABB and Non-Debtor Affiliate Settlement Agreement (Lummus), dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the *"Settlement Agreement"*); capitalized terms used but not defined herein shall have the meanings ascribed to them in the Promissory Note of even date herewith made by Lummus to the Lummus Asbestos PI Trust in the initial principal amount of $33,000,000 (the *"Lummus Note"*);

WHEREAS, in connection with the Settlement Agreement, Lummus made the Lummus Note;

WHEREAS, the Pledgor has guaranteed Lummus's obligations under the Lummus Note pursuant to that certain **[ABB Oil and Gas]**[2] Guaranty (the *"ABB Oil and Gas Guaranty"*) made by the Pledgor as of an even date herewith in favor of the Permitted Holder;

WHEREAS, as of the date hereof, the Pledgor owns 100% of the Capital Stock of the Debtor, and ABB owns, indirectly, 100% of the Capital Stock of the Pledgor;

WHEREAS, it is a condition precedent to the effectiveness of the Settlement Agreement that the Pledgor execute and deliver this Pledge Agreement to the Lummus Asbestos PI Trust; and

WHEREAS, it is the intention of the parties hereto that the Pledged Securities (as defined herein) be and become collateral to secure the payment and performance of the Obligations (as defined herein);.

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.  *Pledge; Grant of Security Interest.* As security for the due and punctual payment and performance of the Obligations (as defined below), the Pledgor hereby delivers and pledges to the Permitted Holder, certificates representing                shares of the common stock, par value $            per share, of Lummus and any and all accretions, accessions and rights relating thereto, at the time pledged with the Permitted Holder hereunder (collectively, the *"Pledged Securities"*), and the Pledgor hereby pledges, assigns, transfers and grants to the Permitted Holder a security interest in and Lien on all of the Pledged Securities. The certificates representing the Pledged Securities (whether now existing or hereafter received as a result of stock dividends, stock splits, workouts, reorganizations, restructurings or otherwise) are accompanied by stock powers with respect thereto duly executed in blank by the Pledgor as the registered owner of its Pledged Securities. The Pledgor will not cause or permit certificated securities comprising any of the Pledged Securities to be converted to uncertificated securities. The term "Pledged Securities" as used in this Pledge Agreement shall include, in addition to the aforesaid securities, any other securities issued by Lummus or collateral which may from time to time be delivered hereunder as security for the Obligations, together with all the proceeds of any of the foregoing. The term "Lien" as used in this Pledge Agreement shall mean any encumbrance, mortgage, pledge, hypothecation, charge, assessment, preference or other security interest of any kind securing any obligation of any person

Section 2.  *Obligations.* The Pledged Securities from time to time held hereunder shall secure the following obligations (collectively, the *"Obligations"*):

(a) The prompt and complete payment when due (whether by acceleration or otherwise) of all monies due (including interest and charges thereon) to the Permitted Holder under and pursuant to the Lummus Note and the **[ABB Oil and Gas]**[3] Guaranty, each as the same may be from time to time amended, modified, supplemented, extended, renewed, deferred, refinanced, replaced, refunded or restated, in whole or in part, in accordance with the terms and conditions thereof, by operation of law or otherwise; and

(b) Any and all other liabilities and obligations of every name and nature whatsoever of the Pledgor under the Lummus Note and the **[ABB Oil and Gas]**[4] Guaranty, whether such liabilities and obligations be direct or indirect, absolute or contingent, secured or unsecured, now existing or hereafter arising or acquired, due or to become due, whether for principal,

interest (including interest which, but for the filing of a petition in bankruptcy with respect to the Pledgor, would have accrued on any Obligation, whether or not a claim is allowed against the Pledgor for such interest in the related bankruptcy proceeding), fees, expenses, or otherwise.

Section 3.    *Representations and Warranties.* The Pledgor hereby represents and warrants to the Permitted Holder that, as of the Effective Date:

(a) The Pledgor is the legal, beneficial and record owner and has good title to all of the Pledged Securities free and clear of all Liens of every nature whatsoever except to or in favor of the Permitted Holder hereunder, or except as made pursuant to the Contribution Agreement dated as of the date hereof among Pledgor, Debtor, ABB, ABB Holdings and the Combustion Engineering 524(g) Asbestos PI Trust (the "*Contribution Agreement*");

(b) All of the shares of the Pledged Securities have been duly and validly issued and are fully paid and non-assessable;

(c) The Pledged Securities constitute 51% of the issued and outstanding shares of all classes of Capital Stock of Lummus, and there are no presently outstanding options, warrants or other rights to purchase or acquire the Pledged Securities or any other shares of the Capital Stock of Lummus; and

(d) The Pledgor has full power and authority to enter into this Pledge Agreement and to pledge its Pledged Securities as herein contemplated.

---

3    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.
4    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

EXHIBIT A TO THE ABB OIL AND GAS USA INC.
GUARANTY — PLEDGE AND
IRREVOCABLE PROXY

Section 4.    *Issue or Sale of Pledged Securities.* The Pledgor hereby covenants and agrees that it will not:

(a) Except (i) pursuant to a Stock Disposition that results in payment in accordance with Section 1.3(a)(ii) of the Lummus Note of the outstanding principal amount of the Lummus Note plus the amount of interest accrued and unpaid as of the date of the Stock Disposition (a "*Permitted Sale*"), or (ii) as permitted pursuant to Section 17 hereof; directly or indirectly sell, assign, pledge or otherwise encumber or dispose of its Pledged Securities; or

(b) permit the issuer of any of its Pledged Securities, directly or indirectly, to issue or sell any additional shares of Capital Stock or any options, warrants or rights to acquire such shares to the extent that such issuance or sale causes the Permitted Holder to have a first priority Lien on less than 51% of the issued and outstanding shares of all classes of Capital Stock of Lummus; or

(c) create, incur, assume or permit to exist, and will defend the Pledged Securities against, and will take such other actions as are necessary to remove, any Lien or claim on or to the Pledged Securities, other than the Liens created hereby or created pursuant to the Contribution Agreement, and will defend the right, title and interest of Permitted Holder in and to any of the Pledged Securities against the claims and demands of any and all Entities.

Section 5.    *Voting Rights of Pledgor.* Provided that the Pledge Remedy Date (as defined below) has not occurred and any Event of Default is not continuing after such date, the Pledgor shall be entitled to exercise exclusively and in its sole discretion, voting power with respect to its Pledged Securities. After the Pledge Remedy Date and during the continuance of an Event of Default, the Permitted Holder shall have the rights specified in Section 7.

Section 6.    *Distributions and Dividends.*

(a) Upon the dissolution, winding up, liquidation or reorganization of the Debtor, whether in bankruptcy, insolvency or receivership proceedings, or upon an assignment for the benefit of creditors or otherwise, any sum to be paid or any property to be distributed upon or with respect to any of such Pledged Securities shall be paid over to the Permitted Holder to be held by the Permitted Holder as collateral security for the Obligations; *provided* that any cash distribution shall be applied to the payment of Obligations first to any that are interest and then to principal payments in inverse order of maturity.

(b) In the event that any stock dividend shall be declared on any of the Pledged Securities, or any shares of stock or fractions thereof shall be issued pursuant to any stock split involving any of the Pledged Securities, or any property shall be distributed upon or with respect to any of the Pledged Securities, the shares or other property so distributed shall be pledged

and delivered (with any necessary endorsements) to the Permitted Holder to be held as additional collateral security for the Obligations to the extent necessary to ensure that following such pledge and delivery, Pledgor will have pledged pursuant to this Pledge Agreement 51% of the issued and outstanding shares of voting Capital Stock of Lummus. All such shares shall constitute Pledged Securities and are subject to all of the provisions of this Pledge Agreement.

(c) In the event that any cash dividend shall be declared on any of the Pledged Securities, or any distribution of capital shall be made on any of the Pledged Securities, (i) if the Pledge Remedy Date (as defined below) has occurred and an Event of Default is continuing, Pledgor shall cause such dividend to be promptly remitted to the Permitted Holder and such dividend shall be applied toward the satisfaction of the Obligations and any amounts remaining after the satisfaction of the Obligations in full (other than Unmatured Contingent Obligations (as defined below)) shall be promptly remitted to the Pledgor, or (ii) if the Pledge Remedy Date has not occurred and no Event of Default is continuing, such dividend may be retained by the Pledgor.

Section 7.  *Default; Remedies.*

(a) After the date when amounts due under the Lummus Note have become immediately due and payable in accordance with Section 2.2(i) of the Lummus Note (the "*Pledge Remedy Date*"), if an Event of Default is continuing the Permitted Holder shall have full power and authority: (i) to sell or otherwise dispose of the Pledged Securities or any part thereof; (ii) to vote the Pledged Securities with respect to any and all matters and to exercise all rights to payments, conversion, exchange, subscription or otherwise with respect to the Pledged Securities; and (iii) to exercise any and all rights and remedies of a secured party under the Uniform Commercial Code as enacted in the State of New York (the "*UCC*").

(b) To the extent permitted by any applicable law, any sale or other disposition by the Permitted Holder may be by public or private proceedings and may be made by one or more contracts, as a unit or in parcels, at such time and place, by such method, in such manner and on such terms as the Permitted Holder may determine. Except as required by law or pursuant to the terms of the Lummus Note or this Pledge Agreement, such sale or other disposition may be made without advertisement or notice of any kind or to any person. Where reasonable notification of the time or place of such sale or other disposition is required by law or pursuant to the Lummus Note or this Pledge Agreement, such requirement shall have been met if such notice is telegraphed, sent by facsimile, cabled or mailed, postage prepaid, at least fifteen (15) days before the time of such sale or other disposition to each person entitled thereto at such person's address as specified in Section 14 below. To the extent permitted by any applicable law, upon any such sale or sales the Pledged Securities so purchased shall be held by the purchaser absolutely free from any claims or rights of whatsoever kind or nature, including any equity of redemption or any similar rights, all such equity of redemption and any similar rights being hereby expressly waived and released by the Pledgor thereof to the extent permitted by applicable law. In the event any consent, approval or authorization of any governmental agency shall be necessary to effectuate any such sale or sales, the Pledgor shall execute, and hereby agree to cause the issuer of the Pledged Securities to execute, as necessary, all applications or other instruments as may be required; *provided* that the foregoing shall not in any way obligate the Pledgor to register the Pledged Securities under the Securities Act of 1933, as amended. After deducting all reasonable costs and expenses of collection, custody, sale or other disposition or delivery (including legal costs and reasonable attorney's fees) and all other charges due against the Pledged Securities (including any charges of the type described in Section 9 below), the residue of the proceeds of any such sale or other disposition shall be applied to the payment of the Obligations (other than any Obligations under this Pledge Agreement, the Lummus Note, the [ABB Oil and Gas]* Guaranty or the Settlement Agreement that by their terms survive termination of the relevant agreement, but are not, as of the date of determination, due and payable and for which no outstanding claim has been made ("*Unmatured Contingent Obligations*") first to any that are interest and then to principal payments in inverse order of maturity. After applying all or a portion of the proceeds of any such sale or other disposition to the payment of the Obligations (other than Unmatured Contingent Obligations), the remaining residue of the proceeds of any such sale or other disposition shall be promptly remitted to the Pledgor. The Pledgor shall be liable for any deficiency in payment of the Obligations, including all reasonable costs and expenses of collection, custody, sale or other disposition or delivery and all other charges due against the Pledged Securities, as hereinbefore enumerated.

(c) The Pledgor recognizes that the Permitted Holder may be unable to effect a public sale of all or a part of the Pledged Securities by reason of certain prohibitions contained in the Securities Act of 1933, as amended, but may be compelled to resort to one or more private sales to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such Pledged Securities for their own account for investment and not with a view to the distribution or resale thereof. The Pledgor agrees that private sales so made may be at a price and on other terms less favorable to the seller than if such Pledged Securities were sold at public sales, and that the Permitted Holder does not have an obligation to delay the sale of any such Pledged Securities for the period of time necessary to permit such Pledged Securities to be registered for public sale under the Securities Act of 1933,

5    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

as amended. The Pledgor agrees that sales made under the foregoing circumstances shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of any sale made on terms less favorable to the seller resulting from the private nature of the sale.

Section 8.    *Transfer of Pledged Securities and Notation on Books and Records.* Pledgor hereby irrevocably appoints the Permitted Holder after the Pledge Remedy Date if an Event of Default is continuing, as agent to arrange for any and all transfers of its Pledged Securities as the Permitted Holder may from time to time deem advisable and to assist the Permitted Holder in obtaining the benefit of its security interest therein, including, but not limited to, the transfer (subject to the receipt of any required approvals of any Governmental Authority) of the Pledged Securities into the name of the Permitted Holder or its nominee at any time and/or the provision of instructions to the issuers of uncertificated securities or financial intermediaries to initiate actions to enforce any of the Permitted Holder's rights to such Pledged Securities, the foregoing appointment being deemed a power coupled with an interest and irrevocable. The Pledgor shall cause Lummus to mark its share register to indicate the pledge of the Pledged Securities by the Pledgor pursuant to this Pledge Agreement.

Section 9.    *Payment of Taxes, Charges, Etc.* After the Pledge Remedy Date if an Event of Default is continuing, Permitted Holder, at its option, may discharge any taxes or Liens upon the Pledged Securities or otherwise protect the value thereof. All such expenditures incurred by the Permitted Holder shall become Obligations and shall be payable by the Pledgor to the Permitted Holder upon demand and shall bear interest at the rate applicable to the Lummus Note.

Section 10.    *Duties with Respect to Collateral.* The Permitted Holder has no duty to the Pledgor with respect to the Pledged Securities other than the duty to use reasonable care in the safe custody of any Pledged Securities in its possession and such other duties explicitly applicable to secured parties in the Uniform Commercial Code as enacted in the State of New York. Except during the continuance of an Event of Default after the Pledge Remedy Date, the Permitted Holder shall not transfer, sell or create any Liens or otherwise dispose of, the Pledged Securities or any of the certificates representing the Pledged Securities or any related stock powers.

Section 11.    *Waivers.* The Pledgor hereby waives demand, payment, notice of dishonor or protest and all other notices of any kind in connection with the Obligations except notices required by law or by this or any other agreement between or among the Pledgor and the Permitted Holder. The Permitted Holder may release, supersede, exchange or modify any other collateral security (if any) which it may from time to time hold and may release, surrender or modify the liability of any third party without giving notice hereunder to the Pledgor. Such modifications, charges, renewals, releases or other actions shall in no way affect the Pledgor's obligations hereunder. The Permitted Holder may modify Lummus' rights under the Lummus Note in accordance with and to the extent permitted under the Lummus Note without affecting Pledgor's rights and obligations hereunder.

Section 12.    *Expenses.* The Pledgor agrees to pay, indemnify and hold harmless the Permitted Holder from and against (a) during the continuance of an Event of Default, all costs and expenses (including taxes, if any) out of or incurred in connection with any transfer of the Pledged Securities into or out of the name of the Permitted Holder or Permitted Holder's nominees or any other person and (b) all costs and expenses of the Permitted Holder arising out of or incurred in connection with the exercise by the Permitted Holder of its rights hereunder. Any such amount not paid on demand shall bear interest at the default rate applicable to obligations under the Lummus Note and shall be an Obligation hereunder.

Section 13.    *Modification.* This Pledge Agreement may not be modified or amended without the prior written consent of each of the parties hereto.

Section 14.    *Notices.* Except as otherwise expressly provided herein, all notices and other communications made or required to be given pursuant to this Pledge Agreement shall be made in accordance with the provisions of Section 3.6 of the Lummus Note.

Section 15.    *Rights.* No course of dealing between the Pledgor and the Permitted Holder nor any delay in exercising, on the part of the Permitted Holder of any right, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any rights, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies hereunder are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law, including, without limitation, the rights and remedies of a secured party under the UCC.

Section 16.    *Waiver of Set Off and Subrogation.* The Pledgor hereby waives and releases, to the fullest extent permitted by law:

(a) any defense, set off or counterclaim which the Pledgor may otherwise assert against the Permitted Holder; and

(b) any right of subrogation it may have against the Permitted Holder or the Pledged Securities by reason of any of the actions taken by the Permitted Holder hereunder.

Section 17.  *Binding Effect, Etc.*

(a) Neither the Lummus Asbestos PI Trust nor any Permitted Holder may assign or transfer any of its rights or obligations under this Pledge Agreement without the prior written consent of the Pledgor (such consent not to be unreasonably withheld, conditioned or delayed); *provided, however,* that (A) the Lummus Asbestos PI Trust or a Permitted Holder, as applicable, shall under no circumstance (except upon the occurrence and during the continuance of an Event of Default) be permitted to assign or transfer less than all of its rights and obligations under this Pledge Agreement, and any assignment must be made in compliance with federal, state and other applicable securities laws, (B) the assignment or transfer of this Pledge Agreement must be concurrent with the assignment or transfer of the Lummus Note to the same assignee or transferee, (C) the consent of the Pledgor shall not be required for any assignment or transfer consummated after the Pledge Remedy Date if an Event of Default is continuing, unless the effects of such event have been expressly waived in writing, and (D) the Permitted Holder will provide the Pledgor with written notice of any intended assignment or transfer, including the name and notice details of the intended assignee or transferee, and such assignee or transferee agrees in writing to become bound by all of the obligations of the Permitted Holder hereunder.

(b) The Pledgor may not assign or transfer its rights or obligations under this Pledge Agreement without the prior written consent of the Permitted Holder, which consent may be withheld, conditioned or denied by the Permitted Holder in its sole and absolute discretion.

(c) The parties agree that notwithstanding anything else in this Pledge Agreement, nothing shall restrict at any time the ability of the Pledgor to merge with or into, sell all or substantially all of its assets to, or otherwise consolidate with or into, any Wholly Owned Subsidiary of ABB as provided in and subject to the restrictions of Section 17 of the **[ABB Oil and Gas]**[6] Guaranty.

(d) Prior to, or concurrently with, the consummation of any such merger, sale of assets or consolidation, as applicable, the surviving or succeeding Entity shall by written instrument in form and substance reasonably acceptable to the Permitted Holder expressly assume the rights and obligations of the Pledgor hereunder, whereupon such Entity shall be the successor of all rights and obligations of the Pledgor hereunder, with the same effect as if it had been originally named herein; provided; however, that the Pledgor shall not be discharged from, and shall remain liable for, any and all obligations and liabilities under this Pledge Agreement.

---

[6]    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

(e) The Pledgor shall be responsible for and shall pay upon demand all reasonable costs and expenses incurred by the Permitted Holder (including reasonable legal fees and expenses) in connection with such transaction proposed by the Pledgor in Section 17(c) (whether or not such transaction is in fact consummated).

Section 18.  *Severability.* The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision hereof.

Section 19.  *Further Assurances.*

(a) The Pledgor at its sole cost and expense will execute, acknowledge and deliver all such instruments and take all such action as the Permitted Holder from time to time may reasonably request in order to further effectuate the purposes of this Pledge Agreement and to carry out the terms hereof, including without limitation, the execution of stock transfer orders, stock powers, the providing of notification in connection with any book entry security or general intangibles and the providing of instructions to issuers of uncertificated securities or financial intermediaries, and will do all such other acts as the Permitted Holder may reasonably request with respect to the perfection and protection of the security interest granted herein and the security interest effected hereby.

(b) In the event that the Pledgor receives or acquires any additional or substitute shares of voting Capital Stock of Lummus, Pledgor shall promptly pledge and deposit with the Permitted Holder certificates representing a number of such shares of voting Capital Stock as additional security for the Obligations such that, following such pledge, Pledgor will have

pledged pursuant to this Pledge Agreement 51% of the issued and outstanding shares of voting Capital Stock of Lummus. All such shares shall constitute Pledged Securities and are subject to all provisions of this Pledge Agreement.

Section 20.   Provisions to Survive. All representations, warranties, covenants and agreements contained in this Pledge Agreement shall survive the execution and delivery of the Settlement Agreement, the Lummus Note and the ABB Guaranty.

Section 21.   *Captions*. Captions and headings in this Pledge Agreement are for convenience only and in no way define, limit or describe the scope or intent of the provisions hereof.

Section 22.   *Termination*. Upon payment in full of the Obligations in accordance with their terms (other than Unmatured Contingent Obligations);

(a) This Pledge Agreement and the Liens created hereunder shall automatically terminate, the Pledged Securities shall be absolutely free from any claims or rights of whatever kind of nature and any such claims or rights of the Permitted Holder or the Lummus Asbestos PI Trust, and any related stock powers, shall automatically terminate and the Permitted Holder shall promptly return to the Pledgor, at the expense of the Pledgor, certificates evidencing the Pledged Securities, any related stock powers, and any such collateral in the possession or control of the Permitted Holder as has not theretofore been disposed of pursuant to the provisions hereof, together with any moneys and other property at the time held by the Permitted Holder hereunder, and shall deliver to the Pledgor documents in recordable form sufficient to discharge and evidence the discharge of the Liens granted hereunder. Notwithstanding anything to the contrary herein or under the Lummus Note, the Settlement Agreement or the **[ABB Oil and Gas]**[7] Guaranty, the Permitted Holder is hereby irrevocably authorized by Lummus Asbestos PI Trust to take any legal action requested by the Pledgor having the effect of releasing the Pledged Securities upon such payment in full of the Obligations in accordance with their terms (other than Unmatured Contingent Obligations not then due and payable).

(b) Notwithstanding the obligations to return the Pledged Securities set forth in (a) above, in the event of a Permitted Sale, the Permitted Holder hereby covenants to deliver to the Pledgor the original certificates

---

[7]     To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

representing the Pledged Securities and the respective stock powers (or, in the case described in Section 22(c) below, a lost certificate affidavit for the Pledged Securities) at or prior to the time and place of the Closing (as defined below), each as specified on the Sale Notice (as defined below). The Pledgor must provide the Permitted Holder with written notice (the "*Sale Notice*") of any impending Permitted Sale at least ten (10) days prior to the date of the expected closing of such sale (the "*Closing*") specifying the time and place of the Closing. The Sale Notice will be delivered in accordance with the notice provisions in Section 21 of the **[ABB Oil and Gas]**[8] Guaranty. The certificates representing the Pledged Securities provided by the Permitted Holder shall be absolutely free from any claims, Liens or rights of whatsoever kind or nature created by or on behalf of the Permitted Holder or the Lummus Asbestos PI Trust and any such claim or rights shall automatically terminate upon the Closing of such Permitted Sale.

(c) In the event that any certificate representing the Pledged Securities shall have been lost, stolen or destroyed, the Permitted Holder will provide (and in the event of a Permitted Sale, will provide at the Closing) a lost certificate affidavit of that fact, and will provide such assurances as the Pledgor may reasonably direct as indemnity against any claim that may be made against the Pledgor with respect to the certificate alleged to have been lost, stolen or destroyed.

(d) The Permitted Holder agrees to reimburse and indemnify and hold harmless the Pledgor and its officers, directors, managers, members, equity owners, employees, attorneys and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Pledgor or any of its officers, directors, managers, members, equity owners, employees, attorneys or agents in any way relating to or arising out of the failure of the Permitted Holder to comply with this Section 22. This Section 22 shall survive the termination of this Pledge Agreement.

Section 23.   *Conflict*. In the event that there is a conflict between any provision of this Pledge Agreement and the Settlement Agreement, then the provisions of the Settlement Agreement shall control.

Section 24.   *Irrevocable Proxy*.

(a) Subject to terms and provisions of this Pledge Agreement, including, without limitation, Sections 5, 7 and 22 hereof, the Pledgor, being the sole holder and owner of the Pledgor's Pledged Securities, hereby authorizes Permitted Holder, after the Pledge Remedy Date and during the continuance of an Event of Default, to vote for such Pledgor, as the Pledgor's

proxy, at any and all meetings of the shareholders of the issuer(s) of the Pledgor's Pledged Securities such Pledged Securities as Permitted Holder sees fit, in its sole and unfettered discretion, and, as the Pledgor's proxy, to consent or dissent to any action taken without a meeting, and further makes, constitutes and irrevocably appoints the Permitted Holder to act as the true and lawful proxy and attorney-in-fact in the name and on behalf of the Pledgor, with full power to appoint a substitute or substitutes, to vote and execute and deliver written voting consents with respect to the Pledgor's Pledged Securities, to the same extent and with the same effect as the Pledgor could do under any applicable laws or regulations governing the rights and powers of shareholders of the applicable issuer(s) of the Pledgor's Pledged Securities (the irrevocable proxy granted hereunder, the "*Irrevocable Proxy*").

(b) SUBJECT TO TERMINATION OF THIS PLEDGE AGREEMENT IN ACCORDANCE WITH ITS TERMS, THIS PROXY AND POWER OF ATTORNEY ARE IRREVOCABLE AND COUPLED WITH AN INTEREST. This Irrevocable Proxy is being given to Permitted Holder in connection with the pledge to Permitted Holder of the Pledged Securities pursuant to this Pledge Agreement. All power and authority conferred under this Irrevocable Proxy shall not be terminated by any act of the undersigned or by operation of law, by death or incapacity of the undersigned, by lack of appropriate power or authority, or by the occurrence of any other event or events, except as expressly provided in this Pledge Agreement. If, after the execution of this

---

⁸    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

Irrevocable Proxy, any such event or events shall occur, Permitted Holder is nevertheless authorized and directed to vote the shares in accordance with the terms of this Irrevocable Proxy as if such death, incapacity, lack of appropriate power or authority or other event or events had not occurred and regardless of notice thereof. This Irrevocable Proxy shall be binding upon, and enforceable against, all beneficiaries, heirs at law, legatees, distributees, successors, assigns, transferees and legal representatives of the Pledgor.

(c) This Irrevocable Proxy shall automatically terminate upon payment in full of the Obligations (other than Unmatured Contingent Obligations not then due and payable).

Section 25. *Governing Law; Jurisdiction.*

(a) This Pledge Agreement and the rights and obligations of the parties hereto shall be construed in accordance with the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(b) With respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Pledge Agreement (such claims, suits, actions, proceedings, and other disputes, the "*Claims*") each of the parties to this Pledge Agreement hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware (the "*Courts*"), or, if both such Courts are not permitted under applicable law to exercise jurisdiction with respect to the matter in question then, at the sole election of the Permitted Holder, to the jurisdiction of any other federal or state court in the state, county and city of New York, New York and in the County of New Castle or the city of Wilmington, Delaware and each of the parties to this Pledge Agreement agrees that any and all Claims may be brought, heard and determined in such courts.

(c) Each of the parties to this Pledge Agreement agrees that (i) venue shall be proper in such courts and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such courts, including any of the foregoing based upon the doctrine of *forum non conveniens*; and (ii) all process which may be or be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such suit, action, proceeding, claim or dispute) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under Section 3.6 of the Lummus Note and shall be deemed in every respect effective service of process upon such party when so given.

IN WITNESS WHEREOF, the parties hereto have duly executed this Pledge Agreement as of the date first above written.

PLEDGOR:                                      [ABB OIL AND GAS USA, INC.]⁹

                                              By: _____
                                                   Name:
                                                   Title:

*PERMITTED HOLDER:*                    ABB GLOBAL LUMMUS INC. 524(G) ASBESTOS PI TRUST

By: _____
                                          **Name:**
                                          **Title:**

---

[9]    To be updated as required by merger between ABB Oil and Gas USA Inc. and ABB Holdings Inc., with ABB Holdings as the surviving entity.

**Exhibit B**

**To the ABB and Non-Debtor Affiliate
Settlement Agreement ABB Holdings Inc. Guaranty**

## ABB HOLDINGS INC. GUARANTY

### $33,000,000 NOTE

This ABB HOLDINGS INC. GUARANTY (as the same may be amended, restated, supplemented or otherwise modified from time to time, this "*Guaranty*") is made as of the _____, 2005, by ABB Holdings Inc., a Delaware corporation (the "*Guarantor*") in favor of the ABB LUMMUS GLOBAL INC. 524(g) ASBESTOS PI TRUST, (the "*Lummus Asbestos PI Trust*") a trust established pursuant to the Plan (as defined below) pursuant to §524(g) of Title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*) (the "*Bankruptcy Code*"). This Guaranty constitutes one of the "Guarantees" described and defined in the Note and is effective as of the Effective Date.

### WITNESSETH

WHEREAS, the Guarantor has agreed to guarantee the obligations of ABB Lummus Global Inc., a Delaware corporation (the "*Maker*"), to make payments pursuant to the Promissory Note with an initial principal amount of $33,000,000 (the "*Note*") made by the Maker on the date hereof; and

WHEREAS, the Maker is a subsidiary of the Guarantor and the Maker and the Guarantor will benefit from the Plan and the consummation of the transactions contemplated thereby, including the making of the Note.

NOW THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. *Definitions*. As used in this Guaranty, the following terms shall have the following meanings:

"*ABB Ltd*" means ABB Ltd, a Swiss corporation.

"*Consolidated Net Worth*" of any Entity means, as of any date of determination, the sum of all items which pursuant to the generally accepted accounting principles then applicable to the relevant Entity are included in shareholders' or owners' equity on a consolidated balance sheet of such Entity and its Subsidiaries as of such date.

"*Effective Date*" has the meaning set forth in the Glossary.

"*Entity*" has the meaning set forth in the Glossary.

"*Glossary*" means the Glossary of Terms for the Plan Documents, adopted pursuant to the Plan.

"*Guaranteed Note Obligations*" means all indebtedness arising pursuant to the Note, including any costs of collection and/or enforcement of the Note pursuant to Section 2.2(iv) thereof, in accordance with its terms.

"*Guaranteed Obligations*" has the meaning set forth in Section 2(a) hereof.

"*Guaranty Expenses*" means, without duplication, all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Permitted Holder or its Representatives in connection with the collection and/or enforcement of this Guaranty.

"*Other Guaranties*" means any guaranty of the Guaranteed Obligations, other than this Guaranty.

EXHIBIT B TO THE ABB AND NON-DEBTOR AFFILIATE
SETTLEMENT AGREEMENT — ABB HOLDINGS INC.
GUARANTY

"*Permitted Holder*" means, as of any date of determination, the "Permitted Holder" of (and as defined in) the Note as of such date.

"*Plan*" means the Prepackaged Plan of Reorganization of ABB Lummus Global Inc. as modified through August 30, 2005, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, and the exhibits, and schedules to the foregoing, as the same may be in effect from time to time.

"*Representatives*" has the meaning set forth in the Glossary.

"*Subsidiaries*" has the meaning set forth in the Glossary.

Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references herein to Sections, Exhibits and Schedules shall be deemed references to Sections of, and Exhibits and Schedules to, this Guaranty unless the context shall otherwise require. The term "including" means "including without limitation", except when used in the computation of time periods.

For purposes of the computation of time periods, whenever this Guaranty provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occur shall not be included in the computation of days elapsed. The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" means "to and including".

Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Note.

2.  *Guaranty.*

(a) For value received and in consideration of the transactions set forth in the Note and in the Plan, the Guarantor hereby absolutely, irrevocably and unconditionally guarantees for the benefit of the Permitted Holder, as a primary obligor and not merely as a surety, and pursuant to the terms and conditions of this Guaranty, (i) the full and prompt payment of all Guaranteed Note Obligations when due, whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter, and (ii) the due performance and compliance, in its entirety, with the terms of the Note by the Maker (the obligations described in items (i) and (ii), the *"Guaranteed Obligations"*); *provided, however,* that the Guarantor will also be obligated to pay or reimburse the Permitted Holder for the Guaranty Expenses promptly upon written demand from the Permitted Holder, provided that the Permitted Holder provides the Guarantor with such appropriate documentation or other appropriate evidence of the amount and nature of the Guaranty Expenses as reasonably requested by the Guarantor (but which shall not include any documentation the provision of which would result in the waiver of any applicable privilege) and any such documentation or other evidence provided by the Permitted Holder shall be presumed true, correct and complete.

(b) The Guarantor hereby agrees that this Guaranty is an absolute, unconditional guarantee of payment and performance and is not merely a surety or guaranty of collection, and that the Guarantor and the Maker are jointly and severally liable for the Guaranteed Note Obligations, which liability is a continuing, absolute and unconditional obligation of payment, regardless of the solvency or insolvency of the Maker or the Guarantor at any time.

(c) Notwithstanding anything contained in this Guaranty or in the Note to the contrary, the amount guaranteed by the Guarantor hereunder shall be limited to an aggregate amount which, together with other amounts owing by the Guarantor to the Lummus Asbestos PI Trust, is equal to the largest amount that would not be subject to avoidance under Section 548 of the Bankruptcy Code or any applicable provisions of any comparable state law.

3.  *Obligations Unconditional.* (a) The Guarantor hereby agrees that its obligations in respect of this Guaranty shall be enforceable against the Guarantor irrespective of:

(i) the legality, validity, enforceability, avoidance or subordination of any of the Guaranteed Obligations or the Note;

(ii) any law, regulation, or order of any jurisdiction, or any other event, affecting any term of the Guaranteed Obligations or the Note;

(iii) except as provided in Section 2(a) with respect to Guaranty Expenses, the absence of any attempt by, or on behalf of, the Permitted Holder to collect, or to take any other action to enforce, all or any part of the Guaranteed Obligations whether from or against the Maker or any other Entity;

(iv) the election of any remedy available under the Note or applicable law or in equity by, or on behalf of, the Permitted Holder with respect to all or any part of the Guaranteed Obligations;

(v) any change in the corporate existence, structure or ownership of the Maker or the Guarantor;

(vi) any impairment of the capital of the Maker or the Guarantor, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Maker, the Guarantor or their assets, or any resulting release or discharge of the Guaranteed Obligations;

(vii) any exchange, substitution, release, non-perfection or impairment of collateral (if any) securing payment of the Guaranteed Obligations; or any failure of the Permitted Holder to take any steps to perfect and maintain its security interest (if any) in, or to preserve its rights to, any security or collateral (if any) for the Guaranteed Obligations;

(viii) except as set forth in Section 3(b) of this Guaranty with respect to the creation or incurrence of new or additional indebtedness pursuant to the Note, any amendment, waiver, consent, extension, forbearance or granting of any indulgence by, or on behalf of, the Permitted Holder with respect to any provision of the Note, or any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Maker or the Guarantor, including any renewal or extension of the time or change of the manner or place of payment of the Guaranteed Obligations;

(ix) any borrowing or grant of a security interest by the Maker or the Guarantor, as debtor-in-possession, under Section 364 of the Bankruptcy Code;

(x) the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of the claims against the Maker or the Guarantor held by the Permitted Holder for repayment of all or any part of the Guaranteed Obligations;

(xi) the existence of any right, claim, set-off, or defense whether arising from or relating to the Guaranteed Obligations or the Maker or otherwise, that Guarantor may have at any time against the Maker, the Permitted Holder or any other Entity, whether in connection herewith or any unrelated transactions, *provided, however,* that nothing herein shall prevent the assertion of a separate suit or compulsory counterclaim; or

(xii) the cessation for any reason of the liability of the Maker under the Note or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of the Maker or the Guarantor, except, with respect to the Guarantor, for the incurrence of new or additional indebtedness pursuant to the Note without the prior written consent as required by Section 3(b) of this Guaranty and for the requirements of Section 2(a) regarding reimbursement of Guaranty Expenses;

(xiii) any other act or circumstance which might or could be deemed a discharge or modification hereunder other than payment in full of the Guaranteed Obligations;

it being the intent of the parties to this Guaranty, except as provided in Section 16, that the obligations of the Guarantor hereunder are absolute and unconditional under any and all circumstances.

(b) Notwithstanding Sections 3 and 4, or any other provision to the contrary in this Guaranty, any amendment, waiver, modification or change in respect of the terms and conditions of the Note resulting in the creation or incurrence of, or having the effect of creating or incurring, new or additional indebtedness (arising in any manner whatsoever, whether from increases in the principal amount of the Note, interest accrued thereunder or otherwise) shall require the prior written consent of the Guarantor.

4. *Waivers.* (a) With respect to the Guaranteed Obligations, the Guarantor hereby waives acceptance, promptness, diligence, presentment, demand of payment, filing of claims with a court in the event of receivership or bankruptcy of the Maker, protest or notice, all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor and notices of acceptance of this Guaranty or the Note, the benefits of all statutes of limitation, and all other demands and defenses whatsoever (other than payment in full of all Guaranteed Obligations) (and shall not require that the same be made on the Maker as a condition to the Guarantor's obligations hereunder).

(b) Except to the extent the prior written consent of the Guarantor is required pursuant to Section 3(b) hereof, the Permitted Holder is hereby authorized, without notice or demand and without affecting the liability of the Guarantor hereunder, by written agreement with the Maker and from time to time, (i) to renew, extend or otherwise change the time for payment of, or other terms relating to, all or any part of the Guaranteed Obligations, or to otherwise modify, amend or change the terms of the Note; (ii) to accept partial payments on all or any part of the Guaranteed Obligations; (iii) to settle, release, exchange, enforce, waive, compromise or collect or otherwise liquidate all or any part of the Guaranteed Obligations or any other guaranty of all or any part of the Guaranteed Obligations. Any of the foregoing may be done in any manner, without affecting or impairing the obligations of the Guarantor hereunder.

5. *Payments.* All payments to be made by the Guarantor pursuant to this Guaranty shall be made in lawful currency of the United States of America by wire transfer of immediately available funds to the Permitted Holder in accordance with such wire transfer instructions that are provided by the Permitted Holder. All payments under the Guaranty shall be made in full, without any set-off or counterclaim or any deduction or withholding whatsoever, including for any and all present or future taxes. The application of payments and credits (if any) from the Guarantor, the Maker or any other Entity on account of the Guaranteed Note Obligations, shall be determined in accordance with the terms and conditions, if any, of the Note, or otherwise by the Permitted Holder.

6. *Representations and Warranties*. The Guarantor represents and warrants, as of the Effective Date that:

(a) The Guarantor has the right, power, legal capacity and authority to execute and deliver this Guaranty. This Guaranty has been duly authorized by all necessary corporate action and has been duly executed and delivered by the Guarantor.

(b) This Guaranty is a legal, valid and binding obligation of the Guarantor enforceable in accordance with its respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings at law or in equity).

(c) The execution, delivery and performance by the Guarantor of this Guaranty does not conflict with, result in a breach of any of the provisions of, or constitute a default under, the certificate of incorporation or articles of incorporation, or the by-laws, of the Guarantor, or any other material agreement or material contract by which the Guarantor is bound or any applicable material law or material order, rule or regulation of any court or governmental agency having jurisdiction over the Guarantor.

(d) No material order, permission, consent, approval, license, authorization, registration or filing by or with any governmental agency having jurisdiction over the Guarantor is required for the execution and delivery of this Guaranty, other than for such material orders, permissions, consents, approvals, licenses, authorizations, registrations or filings that have been obtained and are in force and effect as of the date hereof.

(e) Other than with respect to (A) such actions related to the case pursuant to Chapter 11 of the Bankruptcy Code of Combustion Engineering, Inc., and (B) such actions related to the case pursuant to Chapter 11 of the Bankruptcy Code of Lummus, the Guarantor has not taken, any action, (nor to the best of its knowledge, have any steps been taken or legal proceedings been started against it) for winding-up, dissolution or reorganization, the enforcement of any security interest over its material assets or for the appointment of a receiver, administrative receiver, or administrator, trustee or similar office of it or any of its material assets.

7. *Liability for Representations and Warranties*. Notwithstanding any other provision in this Guaranty or in the Note to the contrary, the Guarantor shall not be liable for any breach of any representations and warranties made by any other guarantor of the Guaranteed Obligations.

8. *Guarantor Covenants*. The Guarantor covenants and agrees that, from the Effective Date until all Guaranteed Obligations are indefeasibly paid and performed in full:

(a) *Affirmative Covenants*. The Guarantor shall:

(i) *Maintenance of Existence and Qualifications*. Maintain and preserve in full force and effect its existence and good standing (to the extent the concept of good standing exists in the Guarantor's jurisdiction of incorporation) and all other rights, powers, franchises, licenses and qualifications necessary or desirable for its ownership or use of properties or the conduct of its business, except (A) as permitted by Section 16 of this Guaranty, and (B) where the failure to do so would not be reasonably likely to materially and adversely affect the Guarantor's ability to carry out any of the terms and conditions of this Guaranty.

(ii) *Information Covenants*. Furnish to the Permitted Holder

(A) *Annual Financial Statements*. As soon as available but in no event later than ninety (90) days after publication of the ABB Group audited consolidated financial statements, a consolidated balance sheet of the Guarantor and its subsidiaries as of the end of such year and consolidated statements of income, cash flows and changes in stockholders equity for such year (all in reasonable detail and with all notes and supporting schedules and to the extent the Guarantor, in its normal practice issued consolidating financial statements, such financial statements shall be consolidating), audited by an independent certified public accountant as presenting fairly the financial condition of the Guarantor and its subsidiaries as the dates and for the periods indicated and as having been prepared in accordance with the generally accepted accounting principles of the jurisdiction followed by the Guarantor at such time, except as may be otherwise disclosed in such financial statements or the notes thereto.

(B) *Certificate*. Simultaneously with the delivery of each annual financial statement referred to in this Section 8(a)(ii)(A), a certificate executed by an authorized officer of Guarantor certifying that the financial statements being delivered with such certificates are true, complete and correct in all material respects in accordance with the accounting principles of the jurisdiction followed by the Guarantor in effect at the time.

(b) *Negative Covenants.* The Guarantor shall not, unless the Permitted Holder shall otherwise consent in writing sell, lease, or otherwise transfer or dispose of any assets, or consummate any other transactions that materially and adversely affect the Guarantor's ability to perform pursuant to this Guaranty, other than as permitted pursuant to Section 16 of this Guaranty.

9.  *Defaults and Remedies.*

(a) The Permitted Holder shall have the right, power and authority to do all things deemed necessary or advisable to enforce the provisions of this Guaranty and protect its interest in the Note and, upon the occurrence and during the continuance of an Event of Default, the Permitted Holder may institute or appear in such appropriate proceedings permitted or not prohibited under this Guaranty as the Permitted Holder shall deem most effectual to protect and enforce any of its rights hereunder, whether for the specific enforcement of any covenant or agreement in this Guaranty or in aid of the exercise of any power granted herein or in the Note, or to enforce any other proper remedy.

(b) Each and every Event of Default shall give rise to a separate cause of action hereunder, and separate actions may be brought hereunder as each cause of action arises. For so long as such an Event of Default is continuing, the Permitted Holder shall have the right to proceed first and directly against the Guarantor under this Guaranty without proceeding against any other Entity (including the Maker or pursuant to the Other Guaranties), without exhausting any other remedies which it may have and without resorting to any other security (if any) held by the Permitted Holder to secure the Guaranteed Obligations.

10.  *Setoff.* At any time after all or any part of the Guaranteed Obligations have become due and payable (by acceleration or otherwise), the Permitted Holder may, without notice to the Guarantor and regardless of the acceptance of any security or collateral (if any) for the payment thereof, and up to the unpaid amount of the Guaranteed Obligations then due, appropriate and apply toward the payment of all or any part of the Guaranteed Obligations then owing to such Entities (i) any indebtedness due or to become due from the Permitted Holder to the Guarantor, and (ii) any moneys, credits or other property belonging to the Guarantor, at any time validly held by or coming into the possession of the Permitted Holder.

11.  *Financial Information.* The Guarantor hereby acknowledges that it has adequate means of, and assumes sole responsibility for, keeping itself informed of the financial condition of the Maker and any and all other endorsers and/or other guarantors of all or any part of the Guaranteed Obligations, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations, or any part thereof, that diligent inquiry would reveal, and the Guarantor hereby agrees that the Permitted Holder shall have no duty to advise the Guarantor of information known to it regarding such condition or any such circumstances. In the event the Permitted Holder in its reasonable discretion, undertakes at any time or from time to time to provide any such information to the Guarantor, the Permitted Holder shall be under no obligation (i) to undertake any investigation not a part of its regular business routine, (ii) to disclose any information which the Permitted Holder, pursuant to accepted or reasonable practices, wishes to maintain confidential, or (iii) to make any other or future disclosures of such information or any other information to the Guarantor.

12.  *Reinstatement.* Notwithstanding any provision herein to the contrary, the Guarantor agrees that, to the extent that any Entity (including any Permitted Payor) makes a payment or payments to the Permitted Holder on account of the Guaranteed Obligations or the Permitted Holder receives any proceeds of collateral (if any), securing the Guaranteed Obligations, which payments or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required or agreed to be repaid or returned by the Permitted Holder under any bankruptcy law, state or federal law, common law, or equitable cause, then, to the extent of the amount of such payments and proceeds, the portion of the Guaranteed Obligations which has been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the time immediately preceding such initial payment, reduction or satisfaction.

13.  *Subrogation.* The Guarantor hereby agrees that it will not assert, enforce, or otherwise exercise any rights which it may acquire against the Maker or any guarantor pursuant to the Other Guaranties by way of subrogation pursuant to this Guaranty, by any payment made hereunder or otherwise, until the Guaranteed Obligations shall have been paid in full.

14.  *Amendments; Waivers.* (a) No provision of this Guaranty may be waived, amended, supplemented or modified except by a written instrument executed by the Permitted Holder and the Guarantor.

(b) No delay on the part of the Permitted Holder in the exercise of any right or remedy arising under this Guaranty or the Note or otherwise with respect to all or any part of the Guaranteed Obligations, any collateral (if any) or any other guaranty of or security (if any) for all or any part of the Guaranteed Obligations shall operate as a waiver thereof, and no single or partial exercise by the Permitted Holder of any such right or remedy shall preclude any further exercise thereof. Failure by the Permitted Holder at any time or times hereafter to require strict performance by the Maker, the Guarantor or any other guarantor of all or any part of the Guaranteed Obligations or of any of the provisions, warranties, terms and

conditions contained in the Note shall not waive, affect or diminish any right of the Permitted Holder at any time or times hereafter to demand strict performance thereof. No waiver of any Event of Default by the Permitted Holder shall operate as a waiver of any other Event of Default or the same Event of Default on a future occasion, and no action by the Permitted Holder permitted hereunder shall in any way affect or impair the Permitted Holder's rights and remedies or the obligations of the Guarantor under this Guaranty. The remedies herein provided are cumulative and not exclusive of any remedies provided by law or in equity.

15. *Effectiveness; Termination.* This Guaranty shall become effective against the Guarantor upon its execution by the Guarantor and the occurrence of the Effective Date and shall continue in full force and effect and may not be terminated or otherwise revoked, subject to Section 12 hereof, until the Guaranteed Obligations shall have been paid in full.

16. *Consolidation, Successors and Assigns.*

(a) This Guaranty shall be binding upon the Guarantor and upon the successors and permitted assigns of the Guarantor and shall inure to the benefit of the Permitted Holder. The successors and assigns of the Guarantor and the Maker shall include, without limitation, their respective receivers, trustees or debtors-in-possession.

(b) Neither the Lummus Asbestos PI Trust nor any Permitted Holder may assign this Guaranty without the prior written consent of the Guarantor, such consent not to be unreasonably withheld, conditioned or delayed; *provided, however*, that if the Lummus Asbestos PI Trust or a Permitted Holder, as applicable, assigns the Note in accordance with its terms, the Guaranty may be assigned to the assignee of the Note without the consent of the Guarantor.

(c) The Guarantor may not assign or transfer its rights or obligations under this Guaranty without the prior written consent of the Permitted Holder, which consent may be withheld, conditioned, delayed or denied by the Permitted Holder in its sole discretion.

(d) Notwithstanding the preceding paragraph, however, neither such sentence nor anything else in this Guaranty shall restrict at any time the ability of the Guarantor to merge with or into, sell all or substantially all of its assets to, or otherwise consolidate with or into, any Entity which immediately following such transaction, is a direct or indirect Wholly Owned Subsidiary of ABB, *provided, however*, that prior to and immediately after such transaction (unless the Permitted Holder consents otherwise in writing) (i) if the Guarantor is an Entity organized under the laws of a state of the United States of America or the District of Columbia (a "*Domestic Entity*"), the surviving or succeeding Entity (which includes any Entity to which all or substantially all of the assets of the Guarantor have been transferred) is a Domestic Entity, or if the Guarantor is an Entity other than a Domestic Entity (a "*Foreign Entity*"), then the surviving or succeeding Entity (which includes any Entity to which all or substantially all of the assets of the Guarantor have been transferred) may be a Domestic Entity or a Foreign Entity; (ii) the surviving or succeeding Entity shall have, after giving effect to the relevant transaction, a Consolidated Net Worth equal to or greater than the Consolidated Net Worth of the Guarantor, (iii) no Event of Default and, no event which, with the giving of notice or the passage of time, would constitute and Event of Default, shall exist immediately following the consummation of such transaction; (iv) such transaction does not conflict with, or result in a breach of, any of the provisions of, or constitute a default under, the certificate of incorporation or the by-laws of the Guarantor or such surviving or succeeding Entity or any other material agreement or material contract by which the Guarantor or such surviving or succeeding Entity is bound or any applicable law, or any applicable order, rule or regulation of any court or governmental agency having jurisdiction; (v) the consummation of such transaction shall not materially impair the Guarantor's ability to perform pursuant to this Guaranty, (vi) at least 10 days prior to consummation of such transaction, the Guarantor shall deliver to the Permitted Holder written notice of its intent to consummate such transaction, and (vii) at the closing of such transaction, the surviving or succeeding Entity shall deliver, or cause to be delivered, to the Permitted Holder a certificate from the chief executive officer, chief operating officer, or chief financial officer of such Entity to the effect that such officer has reviewed this Guaranty for purposes of giving such certificate, that such officer is familiar with the facts related to the transaction being consummated and that such officer certifies that such transaction complies in all material respects with the provisions of this Section 16 and is being undertaken for a valid business purpose.

(e) Prior to, or concurrently with, the consummation of any such merger, sale of assets or consolidation pursuant to Section 16(d), as applicable, the surviving or succeeding Entity shall by written instrument in form and substance reasonably acceptable to the Permitted Holder expressly assume the rights and obligations of the Guarantor hereunder, whereupon such Entity shall be the successor of all rights and obligations of the original Guarantor hereunder, with the same effect as if it had been originally named herein; provided, however, that the Guarantor shall not be discouraged from, and shall remain liable for, any and all obligations and liabilities under this Guarnaty.

(f) The Guarantor shall be responsible for and shall pay upon demand all reasonable costs and expenses incurred by the Permitted Holder (including reasonable legal fees and expenses) in connection with the transactions proposed by the Guarantor pursuant to Section 17 (d) (whether or not such transaction is in fact consummated).

(g) Any assignment or transfer in breach of this Section 16 shall be null and void and not transfer any interest in this Guaranty to any other Entity.

17.   *Governing Law.* THIS GUARANTY SHALL BE INTERPRETED, AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK.

18.   *Jurisdiction.* With respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Guaranty (such claims, suits, actions, proceedings, and other disputes, the "*Claims*") against the Guarantor, the Guarantor hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware (the "*Courts*"), or, if both such Courts are not permitted under applicable law to exercise jurisdiction with respect to the matter in question, then at the sole election of the Permitted Holder, to the jurisdiction of any other federal or state court in the state, county and city of New York, New York and in the County of New Castle or the city of Wilmington, Delaware.

Subject to the preceding paragraph, the Guarantor and the Permitted Holder hereby (a) submit to the jurisdiction of the courts as and for the limited purpose described above, and (b) agree that any and all Claims may be brought, heard and determined in such courts.

The Guarantor and the Permitted Holder agree that venue shall be proper in such courts and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such courts, including any of the foregoing based upon the doctrine of *forum non conveniens*. The Guarantor and the Permitted Holder hereby agree that all process which may be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such suit, action, proceeding, claim or dispute) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under this Note and shall be deemed in every respect effective service of process upon such party when so given.

19.   *Advice of Counsel.* The Guarantor and the Lummus Asbestos PI Trust represent and warrant to the other that it has analyzed this Guaranty with, and has been advised as to its legal effects by, its legal counsel.

20.   *Notices.* All notices required or permitted under this Guaranty must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Service, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the third business day next following the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this Section 20); provided that to be effective any notice to Guarantor hereunder must also be given to ABB Ltd:

| If to Guarantor: | With copies to, which shall not constitute notice: | ABB Ltd |
|---|---|---|
| ABB Holdings Inc. 501 Merritt 7, 6th Floor P.O. Box 5308 Norwalk, CT 06856-5308 Attn: General Counsel/Chief Financial Officer Facsimile: (203) 750-2307 *(if sending overnight packages use zip code 06851)* | | ABB Ltd Affolternstrasse 44 CH-8050 Zürich Switzerland Attn: General Counsel Facsimile: (41) 43-317-79-92 |
| | | Kirkland & Ellis LLP Citigroup Center 153 E. 53rd Street New York, NY 10022-4675 Attn: Theodore L. Freedman Facsimile: (212) 446-4900 |

21.   *Severability.* Wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such

law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

22.    *Entire Agreement.* This Guaranty represents the final agreement of the Guarantor and the Lummus Asbestos PI Trust with respect to the matters contained herein and may not be contradicted by evidence of prior or contemporaneous agreements between the Guarantor and the Lummus Asbestos PI Trust.

23.    *English Language.* This Guaranty is executed and shall be construed in the English language, and the English language version shall prevail over all others. All instruments, agreements, certificates, opinions and other documents to be furnished or communications to be given or made under the Guaranty shall be in the English language, except that the annual financial statements provided pursuant to Section 8(a)(ii)(A) shall be provided in the language such financial statements are normally prepared by the Guarantor.

24.    *Execution in Counterparts.* This Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

[signature pages follow]

IN WITNESS WHEREOF, this Guaranty has been duly executed by the Guarantor as of the day and year first set forth above.

ABB HOLDINGS INC.

By _____
Name:
Title:

Acknowledged and agreed to
as of the      day of      ,      .

ABB LUMMUS GLOBAL INC. 524(g) ASBESTOS PI TRUST

By: _____
Name:
Title:

**PLAN EXHIBIT B**

**NON-DEBTOR AFFILIATES**

**NON-DEBTOR AFFILIATES**

**ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005**

| Country Name | Company Legal Name |
| --- | --- |
| ALGERIA | ABB Electrical Service Company Spa, Hydra |
| ALGERIA | SpA ABB Lummus Global Algeria, Hydra |
| ALGERIA | SARPI — Société Algérienne pour la réalisation de projets industriels, Alger |
| ANGOLA | ABB Electrica SGPS, Lda., Luanda |
| ARGENTINA | ABB S.A., Buenos Aires |
| ARGENTINA | ABB Tubío S.A., San Luis |
| ARGENTINA | ABB Vetco Gray Argentina S.A., Pcia. De Buenos Aires |
| ARGENTINA | Asea Brown Boveri S.A., Buenos Aires Modulec S.A., San Luis |
| ARUBA (NL) | ABB Import & Export Services Ltd., Oranjestad/Aruba (NA) |
| AUSTRALIA | ABB Australia Pty Limited, Sydney |
| AUSTRALIA | ABB Elsag Bailey Pty Ltd., Regents Park |
| AUSTRALIA | ABB EPT Pty Ltd., Sydney, NSW |
| AUSTRALIA | ABB Euro Pacific Technologies Pty Ltd., Sydney, NSW |
| AUSTRALIA | ABB Fischer & Porter Pty Ltd., Regents Park, NSW |
| AUSTRALIA | ABB Investments Pty Ltd., Sydney, NSW |
| AUSTRALIA | ABB Networks Pty Ltd., Sydney, NSW |
| AUSTRALIA | ABB Offshore Systems, Australia (non legal entity) |
| AUSTRALIA | ABB T&D Administrative Services Pty Ltd., Moorebank, NSW |
| AUSTRALIA | ABB Treasury Centre Australia, Sydney (non legal entity) |
| AUSTRALIA | ABB Vetco Gray Australia Pty Ltd., Melbourne, VIC |
| AUSTRALIA | Allco Constructions (Pty) Ltd, Tomago, NSW |
| AUSTRALIA | Allco Steel Erectors Pty Limited, Tomago, NSW |
| AUSTRALIA | Allco Pty Limited, Tomago, NSW |
| AUSTRALIA | Allco Newsteel Pty Limited, Clayton, VIC |
| AUSTRALIA | Allco Steel Corporation Pty Limited, Tomago, NSW |
| AUSTRALIA | Ascom Equipment Pty. Ltd., Melbourne, VIC |
| AUSTRALIA | Ascom Holdings Pty. Ltd., Melbourne, VIC |
| AUSTRALIA | Allco Steel Queensland Pty Limited, Wacol, QLD |
| AUSTRALIA | Babcock Australia Pty Limited, Sydney, NSW |
| AUSTRALIA | ABB Service Pty Ltd., Sydney, NSW |
| AUSTRALIA | ABB EPT Management Pty Limited, Sydney NSW |
| AUSTRALIA | ABB Group Investment Management Pty. Ltd., Sydney |
| AUSTRALIA | ABB Group Holdings Pty. Ltd., Sydney |
| AUSTRALIA | ABB Industry Pty Ltd., Regents Park, NSW |
| AUSTRALIA | ABB Administrative Services Pty. Ltd., Regents Park, NSW |
| AUSTRALIA | ABB Group Investment LLP, Sydney |
| AUSTRALIA | Mitchell Engineering Pty Limited, Wacol, QLD |

10,603,556

PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

**ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005**

| Country Name | Company Legal Name |
| --- | --- |
| AUSTRALIA | ABB Mineral Slurry Transportation Pty Ltd, Sydney, NSW |
| AUSTRALIA | ABB Net SA Pty Limited, Sydney NSW |
| AUSTRALIA | ABB Redbank Investments Pty Ltd., Sydney |
| AUSTRALIA | Redbank Construction Pty Limited, Warkworth NSW |
| AUSTRALIA | Redbank Project Pty Limited, Warkworth NSW |
| AUSTRALIA | ABB Financial Services Australia Pty Limited, Sydney |
| AUSTRALIA | Trasor Pty. Ltd., Sydney, NSW |
| AUSTRALIA | ABB Transmission & Distribution Pty Limited, Moorebank NSW |

| AUSTRALIA | Westralian Transformers Pty Ltd., Osborne Park, WA |
| AUSTRALIA | Worley ABB Joint Venture, Melbourne |
| AUSTRALIA | Worley ABB Procurement Pty Ltd., Sydney |
| AUSTRIA | ABB AG, Vienna |
| AUSTRIA | ABB Information und Management Service G.m.b.H., Vienna |
| AUSTRIA | ABB Montage GmbH, Innsbruck |
| AUSTRIA | ABB Kent Europe Ltd., Luton/Vienna |
| AUSTRIA | Kraft & Warme Gebaudesysteme GmbH, Vienna |
| BAHRAIN | ABB Technologies W.L.L., Bahrain |
| BAHRAIN | ABB Automatic E.C., Bahrain |
| BELGIUM | Asea Brown Boveri S.A., Brussels |
| BELGIUM | Asea Brown Boveri Electro NV/SA, Zaventem |
| BELGIUM | Asea Brown Boveri Europe Ltd., Brussels |
| BELGIUM | S.A. Helvimo N.V., Brussels |
| BELGIUM | ABB Service n.v., Brussels |
| BELGIUM | Asea Brown Boveri Jumet S.A., Jumet |
| BELGIUM | ABB Energy Service NV, Zaventem |
| BELGIUM | ABB Energy Service NV, Machelen |
| BELGIUM | ABB Industrial IT n.v., Brussels |
| BELGIUM | Asea Brown Boveri De Meester S.A., Brussels |
| BELGIUM | Entrelec NV, Bruxelles |
| BELGIUM | Etablissements E. Duliere s.a., Brussels |
| BELGIUM | Maintenance TV, Zaventem |
| BELGIUM | Sirius Belgium Reassurances S.A., Liege |
| BERMUDA (GB) | Scandinavian Reinsurance Company Ltd., Bermuda |
| BOLIVIA | Asea Brown Boveri Ltda., La Paz |
| BOTSWANA | ABB (Pty) Ltd., Gaborone |
| BOTSWANA | ABB Energy Systems (Pty) Ltd., Gaborone |
| BRAZIL | ABB Ltda., Osasco |
| BRAZIL | Consorcio Lummus Andromeda, Osasco |

10,603,556         PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
| --- | --- |
| BRAZIL | ABB Foundries, Brazil (non legal entity) |
| BRAZIL | ABB Power Lines, Brazil (non legal entity) |
| BRAZIL | ABB Lummus Global Ltda., Osasco |
| BRAZIL | ABB Participacoes Ltda., Osasco |
| BRAZIL | Termobahia Ltda., Osasco |
| BRAZIL | ABB Building Systems, Brazil (non legal entity) |
| BRAZIL | ABB Empreendimentos LTDA, Sao Paulo |
| BRAZIL | ABB Medicao de Energia Ltda., Brazil |
| BRAZIL | ABB Offshore Systems, Brazil (non legal entity) |
| BRAZIL | ABB Offshore Systems, Brazil (non legal entity) |
| BRAZIL | ABB Oil, Gas & Petrochemicals, Osasco (non legal entity) |
| BRAZIL | ABB Participacoes Ltda., Sao Paulo |
| BRAZIL | ABB Structured Finance Brazil, Osasco (non legal entity) |
| BRAZIL | ABB Treasury Center (Brazil), Osasco (non legal entity) |
| BRAZIL | Cellier do Brasil Industria e Comercio LTDA, Sao Paulo |
| BRAZIL | Entrelec Produtos Eletricos, Sao Paulo |
| BRAZIL | Termobahia II Ltda., Bahia |
| BULGARIA | ABB Bulgaria EOOD, Sofia |
| BULGARIA | ABB Avangard AD, Sevlievo |

| | |
|---|---|
| BULGARIA | ABB Control EOOD, Petrich |
| CAMEROON | Asea Brown Boveri S.A., Douala |
| CANADA | ABB Inc., St. Laurent, Quebec |
| CANADA | Bailey-Sea (NFLD) Ltd., ST. John's |
| CANADA | ABB Bomem Inc., Quebec |
| CANADA | Combustion Engineering Technology Investment Corp., St.Laurent, Quebec |
| CANADA | Citeq Inc., Varennes, Quebec |
| CANADA | ABB International Projects Inc., St.Laurent, QC |
| CANADA | ABB Offshore Systems Canada Inc., Nisku |
| CANADA | ABB PTTR Guelph, CA (non legal entity) |
| CANADA | ABB PTTR Quebec, CA (non legal entity) |
| CANADA | ABB PTTR Varennes, CA (non legal entity) |
| CANADA | ABB Vetco Gray Canada Inc., Edmonton, Alberta |
| CANADA | Bomem International Inc., Quebec |
| CANADA | Entrelec Inc., Brossard |
| CANADA | Smartcore Systems Inc., Alberta |
| CHILE | Asea Brown Boveri S.A., Santiago |
| CHINA | ABB (China) Ltd., Beijing |

10,603,556 PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| CHINA | ABB Engineering (Shanghai) Ltd., Shanghai |
| CHINA | ABB Automation Ltd., Hong Kong |
| CHINA | ABB Automation System (Beijing) Limited, Beijing |
| CHINA | ABB Bailey Beijing Controls Co. Ltd., Beijing |
| CHINA | ABB China Ltd., Hong Kong |
| CHINA | ABB Environmental Engineering Ltd., Hong Kong |
| CHINA | ABB Power System Communication & Automation Co. Ltd., Guangzhou |
| CHINA | ABB Yuejin Motors (Shanghai) Co. Ltd., Shanghai |
| CHINA | ABB Chongqing Transformer Company Ltd., Chongqing City |
| CHINA | ABB Distribution Transformer (Hefei) Limited, Anhui |
| CHINA | ABB Xiamen Switchgear Co. Ltd., Xiamen |
| CHINA | ABB (China) Engineering Co. Ltd. Xiamen |
| CHINA | ABB Huadian High Voltage Switchgear (Xiamen) Company Ltd., Xiamen |
| CHINA | ABB Holding Ltd., Hong Kong |
| CHINA | Hua Lu (Sino-Lummus) Engineering Co. Ltd., Beijing |
| CHINA | ABB Beijing Drive Systems Co. Ltd., Beijing |
| CHINA | ABB LV Installation Materials Co. Ltd., Beijing |
| CHINA | ABB Xinhui Low Voltage Switchgear Co. Ltd., Xinhui (Guangdong) |
| CHINA | ABB Xiamen Low Voltage Equipment Co. Ltd., Xiamen |
| CHINA | Long-Po Electrical Co. Ltd., Huaibei Au Hui |
| CHINA | ABB Lummus Global China Co. Ltd., Shanghai |
| CHINA | ABB Shanghai Motors Co. Ltd., Shanghai |
| CHINA | ABB Service Ltd., Hong Kong |
| CHINA | ABB Transmission and Distribution Ltd., Hong Kong |
| CHINA | ABB Shanghai Transformer Co. Ltd., Shanghai |
| CHINA | ABB High Voltage Switchgear Co. Ltd., Beijing |
| CHINA | ABB Hefei Transformer Co. Ltd., Hefei |
| CHINA | ABB Jiangjin Turbo Systems Company Limited, Chongqing |
| CHINA | ABB Xi'an Power Capacitor Company Limited, Xi'an |
| CHINA | ABB Transmission & Distribuition Automation Equipment (Xiamen) Co. Ltd., Fujian |
| CHINA | ABB Xiamen Electrical Controlgear Co. Ltd., Fujian Province |

| | |
|---|---|
| CHINA | ABB Zhongshan Transformer Company Ltd., Zhongshan City |
| CHINA | Guangdong ABB Power Plant Services Co. Ltd., Guangzhou |
| CHINA | Shenzhen Sino-American Meishi ABB |
| CHINA | Investment Company Ltd., Guangdong |
| CHINA | Vetco Gray Petroleum Equipment (Shanghai) Co. Ltd., Shanghai |

10,603,556      PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| COLOMBIA | Asea Brown Boveri Ltda., Bogotá |
| COLOMBIA | ABB Inversiones Ltda., Bogotá |
| COLOMBIA | Termobarranquilla SA, Santafé de Bogotà |
| COTE D'IVOIRE/IVORY COAST | ABB Technology SA, Abidjan |
| COTE D'IVOIRE/IVORY COAST | Azito O & M S.A., Abidjan |
| COTE D'IVOIRE/IVORY COAST | Azito Energie S.A., Abidjan |
| CROATIA | ABB Ltd., Zagreb |
| CYPRUS | ABB Lummus Global Cyprus LTD., Nicosia |
| CZECH REPUBLIC | Entrelec Sro, Brno |
| CZECH REPUBLIC | ABB Elsynn, Prague (non legal entity) |
| CZECH REPUBLIC | Entrelec Ceska Sro, Brno |
| CZECH REPUBLIC | ABB s.r.o., Prague |
| CZECH REPUBLIC | ABB Lummus Global s.r.o., Brno |
| CZECH REPUBLIC | ABB Building Systems, Czeck Republic (non legal entity) |
| DENMARK | ABB A/S, Skovlunde |
| DENMARK | ABB Venture A/S, Odense |
| DENMARK | Veloduct-Renka A/S, Skovlunde |
| DENMARK | STAL Kulde A/S, Odense |
| DENMARK | ABB Satt A/S, Herlev |
| DENMARK | ABB Credit, Odense (non legal entity) |
| DENMARK | ABB Electric, Fredericia (non legal entity) |
| DENMARK | ABB Energi & Industri, Skovlunde (non legal entity) |
| DENMARK | ABB Komponent, Tastrup (non legal entity) |
| DENMARK | ABB Offshore Danmark A/S, Kolding |
| DENMARK | EB Global Engineering Denmark A/S, Copenhagen |
| DENMARK | Flakt Serviceteknik A/S, Odense |
| DENMARK | Zantingh Energi Systemr A/S, Hadsten |
| ECUADOR | Asea Brown Boveri S.A., Quito |
| EGYPT | Asea Brown Boveri S.A.E., Cairo |
| EGYPT | ABB Arab Contractors for Construction, Heliopolis |
| EGYPT | ABB Arab S.A.E., Cairo |
| EGYPT | ABB Automation S.A.E., Heliopolis |
| EGYPT | ABB Automoation, Industries and Petrochemical — AIPC — S.A.E., Heliopolis |
| EGYPT | ABB Group Process Center S.A.E., Cairo |

10,603,556      PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| EGYPT | ABB High Voltage Co. S.A.E., Heliopolis/Cairo |
| EGYPT | ABB Metals & Plastics Manufact. Co. SAE, 10th of Ramadan City |
| EGYPT | ABB Petroleum Technology, Cairo |

| EGYPT | ABB SUSA Egypt LLC, Maadi |
|---|---|
| EGYPT | ABB Turbochargers S.A.E., Suez |
| EGYPT | ABB Transformers S.A.E., El-Nozha El-Gedida |
| EGYPT | Egyptian Maintenance Company, Cairo |
| EL SALVADOR | ABB S.A. de CV, San Salvador |
| ESTONIA | ABB AS, Tallinn |
| ESTONIA | ABB Kunda Service AS, Kunda |
| ETHIOPIA | ABB Manufacturing & Contracting Pvt. Ltd. Co., Addis Ababa |
| ETHIOPIA | ABB-Midroc Industrial Services Pvt. Ltd. Co., Addis Ababa |
| ETHIOPIA | Asea Brown Boveri Ltd., Addis Ababa |
| FINLAND | ABB Oy, Helsinki |
| FINLAND | ABB Credit Oy, Helsinki |
| FINLAND | ABB Current Oy, Helsinki |
| FINLAND | ABB Strömberg DO 25 Oy, Helsinki |
| FINLAND | ABB Strömberg DO 24 Oy, Helsinki |
| FINLAND | ABB Strömberg D08 Oy, Helsinki |
| FINLAND | ABB Strömberg DO 9 Oy, Helsinki |
| FINLAND | ABB Domestic Sales, Helsinki (non legal entity) |
| FINLAND | ABB Strömberg DO 23 Oy, Helsinki |
| FINLAND | OY Ensto Busch-Jaeger AB, Porvoo |
| FINLAND | ABB Energy Partner Oy, Helsinki |
| FINLAND | Fortek Oy, Kemi |
| FINLAND | Kiinteistö Oy Bölenraitti 10, Helsinki |
| FINLAND | Oy Merinova AB, Vaasa |
| FINLAND | Real Current Oy, Helsinki |
| FINLAND | ABB Sähkörinne Kiinteistö Oy, Helsinki |
| FINLAND | Oy Wedeco AB, Vaasa |
| FINLAND | ABB East Ventures Oy, Helsinki |
| FINLAND | ABB Product Services (non legal entity) |
| FINLAND | ABB Service, Helsinki (non legal entity) |
| FINLAND | ABB Shipins Oy, Turku |
| FINLAND | ABB Stromberg DO 26 Oy, Helsinki |
| FINLAND | ABB Stromberg DO 27 Oy, Helsinki |
| FINLAND | ABB TNP International Oy, Vaasa |

10,603,556          PLAN — EXHIBIT B — NON-DEBTOR AFFILIATES
**NON-DEBTOR AFFILIATES**

### ABB GROUP AND ASSOCIATED COMPANIES AS OF JUNE 3, 2005

| Country Name | Company Legal Name |
|---|---|
| FINLAND | Arandur Oy, Vantaa |
| FINLAND | Kanavakangas, Helsinki |
| FINLAND | Kiinteisto Oy Toijalan Hameentie 23, Helsinki |
| FINLAND | Kiinteisto Oy Voyrinkatu 15, Vaasa |
| FINLAND | Kymertek Oy Ltd., Hamina |
| FINLAND | Oy Expilac Ab, Helsinki |
| FINLAND | Ramse Consulting Oy, Helsinki |
| FINLAND | Sahkolahteenmaki-Kiinteistot Oy, Helsinki |
| FINLAND | Voimavasu Oy, Jyvaskyla |
| FRANCE | ABB S.A., Rueil-Malmaison |
| FRANCE | ABB Automation, Massy (non legal entity) |
| FRANCE | ABB Business Services, Rueil-Malmaison |
| FRANCE | Cogelub, Persan |
| FRANCE | ABB Entrelec Division commerciale France, Chassieu (non legal entity) |
| FRANCE | L'Ebenoid, Villeurbanne |